359 So.2d 430 (1978)
The WACKENHUT CORPORATION et al., Petitioners,
v.
Richard CANTY, Respondent.
No. 47442.
Supreme Court of Florida.
April 4, 1978.
Rehearing Denied May 24, 1978.
*431 James E. Tribble of Backwell, Walker, Gray, Powers, Flick & Hoehl, Miami, for petitioners.
Edward A. Perse of Horton, Perse & Ginsberg, and Ronald I. Strauss of Highsmith, Strauss & Nelson, Miami, for respondent.
SUNDBERG, Justice.
This cause is before us on a petition for writ of certiorari because the decision of the District Court of Appeal, Canty v. Wackenhut, 311 So.2d 808 (Fla. 3d DCA 1975), allegedly conflicts with the decisions of this Court in Cloud v. Fallis, 110 So.2d 669 (Fla. 1959) and Bennett v. Jacksonville Expressway Authority, 131 So.2d 740 (Fla. 1961). We have jurisdiction. Article V, Section 3(b)(3), Florida Constitution.
On October 26, 1972 respondent made several purchases in a discount store in Miami, Florida. His shirt was worn outside his trousers in order to cover a colostomy bag, which respondent wore as the result of colostomy surgery, in which the colon is attached at the upper abdomen to an external bag which collects waste material. After completing the purchases, respondent reached the store's exit and was approached by petitioner's employee, a Spanish-speaking security guard, who demanded to see what respondent carried under his shirt. Respondent's explanation was not understood because of the guard's inability to *432 clearly understand English, and so the guard grabbed the bag and pulled it. As a result respondent suffered a prolapse of the colon which necessitated surgical removal of part of the colon and caused additional health problems. Suit for compensatory and punitive damages followed.
At trial, petitioner's personnel manager testified that prospective employees are required by company policy to fill out application forms in English to test their English language abilities. Apparently the procedure was not observed in this case because the guard testified he was given assistance in filling out his application since he could not read English. After training, which consisted of meetings lasting an aggregate of one hour and fifteen minutes, the guard was given a brief orientation and a guard manual. The manual was printed in English, despite the availability of Spanish manuals.
The jury returned a verdict for respondent of $50,000 compensatory and $180,000 punitive damages. Upon petitioner's motion for a new trial the trial court entered the following order:
"THIS CAUSE came on to be heard before the Court upon the motion of the defendants for a new trial. The Court heard argument of counsel for the respective parties, both plaintiff and defendants. The Court is of the opinion that the compensatory damages awarded are adequately sustained by the evidence but that the amount of punitive damages is so grossly excessive and contrary to the evidence as to shock the conscience of the Court, and that a remititur [sic] to the verdict should be made by the plaintiff to the extent of $130,000. The Court having ordered such a remititur [sic] and the plaintiff, through his counsel, having indicated in open court, upon the Court's announcement of said ruling, that he would not accept the remititur [sic]; therefore, in lieu thereof, the Court will grant a new trial to the defendants on all issues as to damages, both compensatory and punitive.
"It is thereupon,
"ORDERED AND ADJUDGED that a new trial is hereby granted as to compensatory and punitive damages only upon the sole ground that the punitive damage verdict is contrary to the evidence and so grossly excessive as to shock the conscience of the Court. In all other respects the motion for new trial is denied."
The District Court of Appeal, Third District, reversed, stating, "There being competent substantial evidence contained in the record in support of the jury's verdict, we hereby reverse the order granting a new trial... ." Wackenhut, supra, at 810. This language created conflict with Cloud, supra, in which this Court recognized the impossibility of reconciling the two rules then being applied by Florida appellate courts when reviewing trial court orders granting motions for new trial. One rule, referred to as the substantial competent evidence rule was stated to be "that presence of `substantial competent evidence' and absence of any showing the jury had been deceived about the force and credibility of the evidence or influenced by outside considerations would demonstrate the error of granting a motion for new trial." Id. at 671. The other rule, referred to as the broad discretion rule was stated at page 671 to be, "that when the verdict is contrary to the `manifest weight and probative force of the evidence and justice of the cause' a new trial should be granted." In order to dispel the confusion created by the two rules, the competent substantial evidence rule was rejected and the law was restated to be that it is the duty of a judge to grant a new trial when he "concludes that the verdict is against the manifest weight of the evidence," id. at 673, or if he determines the jury has been influenced by extra-record considerations or misled by the force and credibility of the evidence.
The District Court's decision to reverse the order for new trial because it found substantial competent evidence in the record in support of the jury's verdict clearly conflicts with the Cloud rejection of the substantial competent evidence rule and establishment of the present rule governing *433 appellate review of trial court orders for new trial.
In Bennett v. Jacksonville Expressway Authority, supra, the Cloud rule was liberalized when applied to appellate courts reviewing new trial orders in eminent domain proceedings. The value of two tracts of land was at issue in the trial. Just compensation had been asserted to be $40,300 and $72,750 in the declaration of taking and had been valued at $47,755 and $74,210 by a court-appointed appraiser. Given an opportunity to amend its declaration of taking the State again represented full compensation for the first tract to be $40,300. Full compensation for the second tract was recomputed to be $70,850, slightly less than the value asserted in the original declaration. Despite the relatively consistent valuations asserted once by court-appointed appraiser and twice by the State, an appraiser, called as a State witness at trial, valued the tracts at the considerably lower figures of $27,700 and $51,500. The landowners' expert witness valued the property at $64,300 and $129,620, creating a respective range of values from $27,700 to $64,300 and from $51,500 to $129,620 for the consideration of the jury. The jury returned verdicts of $30,116 and $57,790. Although the verdicts were within the ranges presented by the evidence, and although the trial was free from error, the judge ordered a new trial because his conscience was shocked by the low verdicts. The District Court reversed, concluding that the trial judge's judicial conscience had been shocked unjustifiably. This Court granted certiorari because of conflict between the District Court decision and Cloud and quashed the decision below. Although the order for new trial did not recite that the verdict was against the manifest weight of the evidence, in which case Cloud would have held it the trial court's duty to grant a new trial, it did recite that the judge was "shocked" by the outcome. As a result, this Court felt the trial judge was
"... conscience-bound to do exactly what he did, namely, grant a new trial. After all the owners' properties were being taken from them for public use and this cannot be done except full compensation is forthcoming under the fundamental safeguard found in both the State and Federal Constitutions, a protection the judge was duty-bound to secure to them." 131 So.2d at 742.
At first glance it would seem that the order for new trial in this case should be able to withstand appellate review since it is predicated on the same basis as the Bennett order for new trial: shock to the judicial conscience. In turn it would seem that the District Court's decision to reverse in this case would conflict with Bennett. However, the two cases are distinguishable for two reasons. First, the issues at the respective trials were vastly dissimilar. In this case the trial court, sitting in a personal injury suit, was not duty-bound to secure the plaintiff's constitutional right to just compensation for the taking of his property as was the trial court in the Bennett eminent domain proceeding. Second, and most crucially from a perspective of appellate duty of review, the respective orders, apart from noting judicial shock, are entirely different. In this case, the order granting new trial offered no explanation of what triggered the trial court's judicial shock at the size of the verdict. On the contrary, the Bennett order offered as an explanation for the trial court's shock at the low verdict a detailed analysis of the evidence before the jury:
"In his order the learned circuit judge, ... referred to the original appraisals on the bases of which the deposits had been made and on the strength of one of which the sum of $60,000 had been paid to one of the owners, a sum considerably in excess of the amount awarded by the jury. He recalled that upon amendment of the declaration there had been no appreciable change in the figures. In parallel columns he set out the appraisals of petitioners, the testimony of petitioner's and owner's experts, and the verdicts which demonstrated the disparities among the estimates presented by the parties and those accepted by the jury.
* * * * * *

*434 "Plainly, then, the trial judge felt that he could not condone the condemning authority's making representations as to values, taking owners' properties away  and beyond recovery  making no effort in the amended declaration to correct any errors as to values that had been discovered, and introducing in the trial testimony creating the material disparities." 131 So.2d at 742.
In addition, the order in this case does not point to the record for support of the trial court's determination that $50,000 of the $180,000 punitive damage award was proper but the excess was not. In requiring the entry of a remittitur to correct an excessive verdict the rule is that the amount of the excess must clearly appear from the record. De La Vallina v. De La Vallina, 90 Fla. 905, 107 So. 339 (Fla. 1926). By comparison, in Bennett, the order of the trial court pointed to evidence in the record to support the additur offered the defendant as an alternative to a new trial.
"[In] his order [the judge] announced that the verdicts would fall unless by additur the amounts stated in them were raised to the exact amounts named in the original declaration and substantially repeated in the amended declaration." 131 So.2d at 742.
The deficiency of the order in this case is serious. By requiring a remittitur without an explanation founded in the record and then, once the remittitur is rejected, by ordering a new trial without stating reasons capable of demonstration in the record or beyond the record (such as influences which aroused the passion and prejudice of the jury), the trial court left the District Court of Appeal to grasp at straws when it reviewed the order.
Certainly a trial court is in a better position than an appellate court to pass on the ultimate correctness of a jury's verdict. Pyms v. Meranda, 98 So.2d 341, 343 (Fla. 1957), but superior vantage point does not give a trial judge unbridled discretion to order a new trial. Consequently, to facilitate intelligent appellate review of such orders the reasons which produced the need for the new trial must be set forth in the order. Stewart Bonded Warehouse Inc. v. Bevis, 294 So.2d 315, 317 (Fla. 1974).
This Court has struggled with the question of what reasons contained in an order for new trial will suffice to enable it to withstand appellate review. Cohen v. Margoa, 309 So.2d 539 (Fla. 1975). But, by and large, beginning with Cloud and continuing through recent decisions of this Court, a consistent standard has emerged. Cloud stated at page 673:
"When the judge, who must be presumed to have drawn on his talents, his knowledge and his experience to keep the search for the truth in a proper channel, concludes that the verdict is against the manifest weight of the evidence, it is his duty to grant a new trial, and he should always do that if the jury has been deceived as to the force and credibility of the evidence or has been influenced by considerations outside the record."
The meaning of this statement was refined in Hodge v. Jacksonville Terminal Co., 234 So.2d 645 (Fla. 1970), where this Court reviewed a District Court decision which, on the authority of Cloud, had affirmed an order for new trial that offered no reason for the necessity of a new trial other than that the verdict was contrary to the evidence. Finding the decision to conflict with Nunberg v. Brodsky, 224 So.2d 727 (Fla. 3d DCA 1969), this Court quoted with approval the following from Nunberg:
"The second ground of the order, that the verdict was not `consistent' with the evidence, was insufficient upon which to grant a new trial. The trial court did not find or conclude that the verdicts were against the manifest weight of the evidence, for which, had he so concluded, a new trial properly could have been granted, as held in Cloud v. Fallis, Fla. 1959, 110 So.2d 669, 673. See also Florida East Coast R. Co. v. Hayes, 66 Fla. 589, 64 So. 274, 276; Burnett v. Soule, 78 Fla. 507, 83 So. 461, 462; Greiper v. Coburn, 139 Fla. 293, 190 So. 902, 904; Hart v. Held, 149 Fla. 33, 5 So.2d 878, 882; Grand Assembly, etc. v. New Amsterdam Casualty Co., *435 Fla.App. 1958, 102 So.2d 842, 846. Those cases reiterate the rule that where the evidence on the issues made is in conflict, and the verdict found thereon is not manifestly against the weight of the evidence, the court will not interfere and set aside the verdict of the jury." Hodge, supra, at 646, 647.
This Court went on to say:
"... Setting aside a jury verdict on this ground requires more than a cursory disposition of a ground of a Motion for New Trial that `the verdict is contrary to the evidence.' There should be an independent determination by the trial judge that `the jury was influenced by considerations outside the record'... ." Id. at 647.
* * * * * *
"The reliance by the district court on our decision in Cloud v. Fallis to support its decision affirming the order granting the new trial because the verdict was `contrary to the evidence' is misplaced. The motion for new trial did not allege and the trial judge did not find that the verdict was against `the manifest weight of the evidence' which is the rule announced in Cloud v. Fallis, supra." Id. at 648.
Cloud and Hodge together were applied to the problem of when remittitur or, in the alternative, a new trial may be ordered by a judge (the problem presented in this case) in Laskey v. Smith, 239 So.2d 13 (1970). This Court there concluded at page 14:
"A jury's determination of damage is reviewable by the trial judge on precisely the same principles as govern his superintendence of determinations of liability. Mr. Justice Drew stated them clearly in Hodge v. Jacksonville Terminal Company, Fla., 234 So.2d 645, opinion filed April 22, 1970. The record must affirmatively show the impropriety of the verdict or there must be an independent determination by the trial judge that the jury was influenced by considerations outside the record.
"In other words, the trial judge does not sit as a seventh juror with veto power. His setting aside a verdict must be supported by the record, as in Cloud v. Fallis, Fla. 1959, 110 So.2d 669, or by findings reasonably amenable to judicial review. Not every verdict which raises a judicial eyebrow should shock the judicial conscience.
"In its movement toward constancy of principle, the law must permit a reasonable latitude for inconstancy of result in the performance of juries. The trial judge's review of that performance is likewise sustainable within a broad range provided that the record or findings of influence outside it support his determination... ."
Although an order for new trial need not incant language to the effect that the verdict is against the manifest weight of the evidence or was influenced by considerations outside the record, the order must give reasons which will support one of these two conclusions so that it will be susceptible of appellate review. See Thompson v. Williams, 253 So.2d 897 (Fla. 3d DCA 1971). Orders granting motions for new trials should articulate reasons for so doing so that appellate courts may be able to fulfill their duty of review by determining whether judicial discretion has been abused.
Since the order for new trial is deficient because it does not contain reference to the record in support of its conclusion that remittitur of the punitive damage award is necessary to cure the excessiveness of the punitive damage verdict (its basis for requiring new trial), we have made an independent review of the record in search of support of that conclusion. We find none.
When claims for punitive damages are made, the respective provinces of the court and jury are well defined. The court is to decide at the close of evidence whether there is a legal basis for recovery of punitive damages shown by any interpretation of the evidence favorable to the plaintiff. Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214, 222 (Fla. 1936). A legal basis for punitive damages exists where torts are committed in an outrageous manner or with fraud, malice, wantonness *436 or oppression. Id. at 221. Once the court permits the issue of punitive damages to go to the jury, the jury has the discretion whether or not to award punitive damages and the amount which should be awarded. Punitive damages "are peculiarly left to the discretion of the jury as the degree of punishment to be inflicted must always be dependent on the circumstances of each case, as well as upon the demonstrated degree of malice, wantonness, oppression, or outrage found by the jury from the evidence." (emphasis supplied) Id.
Since the degree of punishment to be inflicted on the defendant is peculiarly within the province of the jury, courts will hold punitive damages excessive only in unusual circumstances. Florida East Coast Railway Co. v. Morgan, 213 So.2d 632 (Fla. 3d DCA 1968). The court below recognized three situations where courts in this State have determined that the amount of a verdict for punitive damages is excessive:
"First, where the punitive damages awarded bears no relation to the amount the defendant is able to pay and results in economic castigation. Maiborne v. Kuntz, Fla. 1952, 56 So.2d 720; Hutchinson v. Lott, Fla.App. 1959, 110 So.2d 442. Second, where the tort committed is lacking the degree of maliciousness and/or outrageous disregard for the plaintiff's rights required to sustain the amount of the verdict. Hutchinson v. Lott, supra; Zippy Mart, Inc. v. Mercer, Fla.App. 1970, 244 So.2d 522. Third and last, where the amount of punitive damages fixed by the jury bears no reasonable relation to the compensatory damages awarded and which is excessively out of relation to compensatory damages. Air Line Employees Association International v. Turner, Fla.App. 1974, 291 So.2d 670; Lan-Chile Airlines, Inc. v. Rodriguez, Fla.App. 1974, 296 So.2d 498." Wackenhut, supra, at 809.
An unusual circumstance which demands a new trial on the issue of punitive damages also might occur as in Castlewood Int'l. Corp. v. LaFleur, 322 So.2d 520 (1976), when the judge himself injected prejudicial error by charging the jury as to the legal definition of "gross negligence," although this was not an element of the case.
It is clear to us that the trial judge in this case ignored the role of the jury because none of the foregoing unusual circumstances appear in the record. The award (2% of a net worth of 9.2 million dollars) is not economic castigation of Wackenhut. There was a legal basis for punitive damages being assessed, else the issue should not have been permitted by the judge to go before the jury. Likewise the trial court obviously concluded there was a legal basis for punitive damages by permitting $50,000 of the award to stand. As to the requirement that punitive damages bear a reasonable relationship to the compensatory damages, the trial court implicitly recognized such requirement in its order granting the new trial. Although it found the compensatory damages to be supported by the evidence a new trial on both compensatory and punitive damages was ordered when the remittitur was declined. Notwithstanding the application of such a condition by several District Court of Appeal decisions, e.g., Turner and Rodriguez, supra, this requirement has been repudiated recently by this Court in Lassitter v. Intern. Union of Op. Engin., 349 So.2d 622 (Fla. 1976). For the reasons expressed in Lassitter, it is not required that punitive damages must bear some reasonable relationship to the actual damages awarded by the jury and the trial court erred in implicitly applying such a standard.
Since no basis appears in the record which would lead to the conclusion that the punitive damage award is excessive, the District Court was correct in reversing the trial court's order for new trial even though the District Court articulated an erroneous standard for review.
Accordingly, we reaffirm the Cloud rule as this Court has applied it in Laskey to orders for new trial which are entered as alternatives to remittiturs. Before such an alternative order may be entered either the record must affirmatively show the impropriety of the verdict or there must be an *437 independent determination that the jury was influenced by considerations outside the record. The trial judge in this case acted as a seventh juror with veto power. The province of the jury ought not be invaded by a judge because he raises a judicial eyebrow at its verdict.
The writ of certiorari is discharged.
It is so ordered.
BOYD, ENGLAND, HATCHETT and KARL, JJ., concur.
OVERTON, C.J., dissents with an opinion, with which SMITH, District Court Judge, concurs.
SMITH, District Court Judge, dissents with an opinion.
OVERTON, Chief Justice, dissenting.
I strongly disagree with the majority opinion. The facts do not justify the result, and the law has clearly been misapplied.
The complaint of the respondent sets forth causes of action for false arrest and imprisonment, battery, and negligence. Only the battery and negligence claims were allowed to go to the jury. The individual security guard whose conduct brought on this lawsuit was not made a party defendant.
The evidence most favorable to the respondent Canty reflects that he was leaving the area of the cash register and nearing the exit when the security guard approached him. The guard, a native of Cuba, had difficulty understanding the English language. He asked Mr. Canty what he was carrying under his shirt, and Mr. Canty responded that he had an operation and was wearing a stomach bag. The guard asked Canty to go with him to the back of the store, but did not touch him. When the two reached the back of the store, the guard was unable to understand the further responses from Mr. Canty, and he reached under Mr. Canty's shirt and pulled hard on the colostomy bag, causing Mr. Canty to cry out in pain. The testimony established that the guard could not read English at the time he was hired by Wackenhut, and, consequently, had not read the guard's manual which had been supplied by the company. He had, however, received some on-the-job training. The guard's supervisors at Wackenhut were aware of his communication problem.
Based on all the evidence, the jury was justified in finding that a battery had been committed and that, as a result of the incident at the store, Mr. Canty incurred substantial medical expenses, suffered pain and humiliation, and was therefore entitled to compensatory damages. Glickstein v. Setzer, 78 So.2d 374 (Fla. 1955). The jury was further justified in finding that the security guard was negligent in his handling of what he perceived to be a person attempting to steal merchandise, and that Wackenhut Corporation was negligent in the hiring and supervision of its employee.
The verdict for $50,000 compensatory damages was justified. I agree with the trial judge that the punitive damage verdict of $180,000 against Wackenhut Corporation was "so grossly excessive and contrary to the evidence as to shock the conscience of the court." The trial judge ordered a remittitur of $130,000 of a $180,000 punitive damage verdict. The majority opinion in setting aside this remittitur has totally misapplied the law pertaining to the authority of a trial judge to grant a remittitur or order a new trial.
It is important to note the only issue on which the trial judge could have permitted the jury to return a verdict of punitive damages in favor of the respondent was on the battery count.
Punitive damages were foreclosed on the negligence count because the conduct of the security guard and of the Wackenhut Corporation did not, as a matter of law, correspond to that type of conduct required in order for the law to impose the sanction of punitive damages. The rule is well stated in Sauer v. Sauer, 128 So.2d 761, 762 (Fla. 2d DCA 1961):
The character or degree of negligence necessary to sustain an award of punitive damages must be of a gross and flagrant character, evincing reckless disregard of *438 human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety, welfare, and rights of others which is equivalent to an intentional violation of them. Carraway v. Revell, Fla. 1959, 116 So.2d 16. The court in the Revell case also noted that the character of negligence necessary to sustain a conviction for manslaughter is the same as required to sustain a recovery for punitive damages with the distinction of course being the degree of proof.
The rule that the negligent conduct must be so gross and flagrant as to evince a reckless disregard of the safety and welfare of the public in order to support an award of punitive damages is well established in Florida law. Dowling Lumber Co. v. King, 62 Fla. 151, 57 So. 337, 339 (1911); Russ v. State, 140 Fla. 217, 191 So. 296, 298 (1939); Carraway v. Revell, 116 So.2d 16 (Fla. 1959); Rodriguez v. Gonzalez, 157 So.2d 848 (Fla. 2d DCA 1963); Jacksonville Frosted Foods, Inc. v. Haigler, 224 So.2d 437 (Fla. 1st DCA 1969); St. Petersburg Sheraton Corporation v. Stuart, 242 So.2d 185, 188 (Fla. 2d DCA 1970). Gross negligence alone is not sufficient to justify an award of punitive damages. Dowling Lumber Co. v. King, 62 Fla. 151, 57 So. 337 (1911); Carter v. Lake Wales Hospital Association, 213 So.2d 898 (Fla. 2d DCA 1968). The character of negligence necessary to support an award of punitive damages is the same as is required to sustain a conviction for manslaughter (although, of course, the quantum of proof is different). Carraway, supra; Sauer, supra. Our holding in Ingram v. Pettit, 340 So.2d 922 (Fla. 1976), that punitive damages may be awarded where voluntary intoxication is involved in an automobile accident, without regard to proof of carelessness, is not inconsistent with the above-cited rules. It is obvious that neither the conduct of the guard nor the conduct of his supervisors was "culpably negligent," and no negligent conduct of the defendant in the case sub judice could have subjected Wackenhut to punitive damages. A comparison of the conduct in the present case with conduct in automobile accident cases in which no punitive damages have been allowed makes this conclusion abundantly clear. In Baynard v. Liberman, 139 So.2d 485 (Fla. 2d DCA 1962), the court found that the trial court properly refused to instruct the jury on punitive damages where the defendant had run two traffic lights in a row and, in running the third, struck and injured the plaintiff. But in Sauer v. Sauer, 128 So.2d 761 (Fla. 2d DCA 1961), the court held that an award of punitive damages was proper where the defendant directed his minor sister to hit the plaintiff with the automobile she was driving, and then told her to keep going after inflicting the injury. There is simply not sufficient evidence of the type of negligent conduct in the record here to permit an award of punitive damages.
With reference to the battery count, different principles apply. If a defendant has committed an intentional assault and battery, without legal justification, the law implies the presence of malice, and punitive damages may, in proper circumstances, be recovered. Holland v. Glass, 213 So.2d 320 (Fla. 4th DCA 1968); Bryson v. Swank, 166 So.2d 833 (Fla. 3rd DCA 1964); Anderson v. Maddox, 65 So.2d 299 (Fla. 1953). The security guard in the present case committed a battery on Mr. Canty. The jury apparently chose to believe Mr. Canty, who testified that the guard actually grabbed the colostomy bag, rather than the guard, who testified that he only grabbed the shirt. The guard apparently grabbed at the object under the shirt of Mr. Canty, who had neither attempted to flee the premises nor assaulted the guard. This Court is without authority to reexamine that finding. The guard was not made a defendant in this action. It is his employer who is the defendant, and the employer is vicariously liable for both compensatory and punitive damages caused by the tortious conduct of an employee acting in the scope of his employment. Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214, 221 (1936).
*439 Upon these facts, we come directly to the question of whether the trial judge abused his discretion in ordering the remittitur of a portion of the punitive damages or, in lieu thereof, a new trial. In fixing the amount of punitive damages, the jury may take into account the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the particular incident, including any mitigating circumstances which may operate to reduce such damages. Rinaldi v. Aaron, 314 So.2d 762 (Fla. 1975). There is nothing in the record to suggest that the guard acted out of any ill will toward the respondent. Nor is there anything to suggest that this guard had, in the past, assaulted other patrons in the stores in which he worked as a security guard. The guard was overzealous in carrying out his assigned duties and caused serious injuries to the respondent by his actions. Those injuries were met by an award of $50,000 in compensatory damages. While the law supplies the presence of malice because the guard intended to perform the wrongful act and had no legal excuse, Farish v. Smoot, 58 So.2d 534 (Fla. 1952), still, the fact that there is no suggestion of bad faith, the administering of a deliberate beating, or any other conduct which evinces reckless disregard of human life, should go to mitigate the amount of punitive damages awarded. It is undisputed that Canty's colostomy bag caused a visible bulge beneath his shirt and that an object of a color different from the shirt was visible through the fabric of the shirt. In addition, after paying for the purchases, Canty covered the area of the bulge with his parcel, further arousing the suspicion of the guard. These were facts which were obvious to the trial judge, and the judge was acting within his discretionary authority when he concluded that the tort was of an insufficiently malicious nature to permit a $180,000 punitive damage award to stand. E.g., Zippy Mart, Inc. v. Mercer, 244 So.2d 522 (Fla. 1st DCA 1970).
It has long been the law in this state that the question of the amount of punitive damages to be awarded is peculiarly within the province of the jury, Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214, 221 (1936). As a rule was traditionally stated, a verdict should not be disturbed on the ground of excessiveness unless it is so excessive as to shock the judicial conscience, or unless it is the result of passion or prejudice on the part of the jury, or unless it clearly appears that the jury ignored the evidence or misconstrued the merits of the evidence relating to the amount of damages recoverable. Odoms v. Travelers Insurance Company, 339 So.2d 196 (Fla. 1976); Bartholf v. Baker, 71 So.2d 480, 484 (Fla. 1954); see 9A Fla.Jur. Damages § 99 (1972). In our recent decision of Bould v. Touchette, 349 So.2d 1181, 1185 (Fla. 1977), this Court recognized the ambiguity inherent in applying the standard that a jury verdict may be overturned if it is so excessive as to "shock the judicial conscience." We stated:
In tort cases damages are to be measured by the jury's discretion. The court should never declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed. The verdict should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate. [citations omitted] 349 So.2d at 1184-85.
The question of whether or not a jury verdict is excessive is principally with the trial judge. The trial judge is the only objective lawyer on the scene. He sees and hears the witnesses firsthand. His opinion is entitled to "great weight" by any reviewing court. Cloud v. Fallis, 110 So.2d 669 (Fla. 1959). In Cloud, this Court stated:
When a motion for new trial is made it is directed to the sound, broad discretion of the trial judge .. . [citations omitted] who because of his contact with the trial and his observation of the behavior of those upon whose testimony the finding of fact must be based is better positioned than any other one person fully to comprehend the processes by which the ultimate decision of the triers of fact, the jurors, is reached... .
* * * * * *

*440 Inasmuch as such motions are granted in the exercise of a sound, broad discretion the ruling should not be disturbed in the absence of a clear showing that it has been abused... . 110 So.2d at 673. (emphasis supplied)
The unanimous Cloud decision clearly establishes that in Florida the discretion vested in trial courts when dealing with motions for a new trial is truly "very broad and liberal." 110 So.2d at 673. Accord, Pyms v. Meranda, 98 So.2d 341, 343 (Fla. 1957); Hodge v. Jacksonville Terminal Company, 234 So.2d 645, 648 (Fla. 1970). If reasonable men could differ, the trial judge's ruling on a motion for a new trial or remittitur must be upheld. Mere disagreement on the part of the appellate court is insufficient to permit the overturning of the trial court's determination; the showing of an abuse of discretion must be clearly unreasonable and must patently appear from the record. Castlewood International Corporation v. LaFleur, 322 So.2d 520, 522 (Fla. 1975). In Laskey v. Smith, 239 So.2d 13 (Fla. 1970), this Court stated:
In its movement toward constancy of principle, the law must permit a reasonable latitude for inconstancy of result in the performance of juries. The trial judge's review of that performance is likewise sustainable within a broad range provided that the record or findings of influence outside it support his determination. ... 339 So.2d at 14. (emphasis supplied)
There is ample evidence in the record which supports the trial judge's exercise of his discretion in granting the remittitur, or in lieu thereof, a new trial, because the verdict on punitive damages was beyond "the maximum limit of a reasonable range within which the jury may properly operate." Bould v. Touchette, 349 So.2d 1181, 1185 (Fla. 1977).
In Carolina Portland Cement Co. v. Baumgartner, 99 Fla. 987, 128 So. 241, 247 (1930), we stated that "judicial discretion" does not imply that a court may act according to mere whim or caprice; such discretion must be exercised within the limits of the applicable principles of law and equity. Judicial discretion is a power exercised by courts in determining questions to which no strict rule of law is applicable; from their very nature, the questions are controlled largely by the judgment and evaluation of the judge who is the only objective lawyer on the scene. 1 Bouvier's Law Dictionary and Concise Encyclopedia 884 (8th ed. 1914).
This discretionary power to grant or deny a new trial or remittitur is derived from the duty of the trial judge to prevent what he considers a miscarriage of justice. Castlewood International Corporation v. LaFleur, 322 So.2d 520, 523 (Fla. 1975) (Chief Justice Overton, concurring).
The trial judge in the present case did not "[act] as a seventh juror with veto power," as asserted by the majority. His order was not arbitrary or unreasonable. To the contrary, his ruling finds very substantial support in the record. Under the "broad discretion" rule adopted in Cloud, this Court should uphold the decision of the trial judge in ordering a new trial. In failing to do so, the majority undermines a remedy which has been part of the common law since at least 1665, that of granting a new trial to correct an unjust jury verdict. Warner v. Goding, 91 Fla. 260, 107 So. 406 (1926); 3 Barron & Holtzoff's Federal Practice and Procedure § 1302 (Wright ed. 1958). Lord Mansfield, in Bright v. Eynon, 97 Eng.Rep. 365, 366 (K.B. 1757), writing in the year 1757, stated:
Trials by jury, in civil causes, could not subsist now, without a power, somewhere, to grant new trials.
* * * * * *
If unjust verdicts, obtained under these and a thousand like circumstances, were to be conclusive forever, the determination of civil property, in this method of trial, would be very precarious and unsatisfactory. It is absolutely necessary to justice, that there should, upon many occasions, be opportunities of reconsidering the cause by a new trial.
See also Aetna Casualty & Surety Co. v. Yeatts, 122 F.2d 350 (4th Cir.1941). At common law, in fact, the order of the trial *441 judge on this issue was simply not reviewable on appeal. 3 Barron & Holtzoff's Federal Practice and Procedure §§ 1302, 1302.1 (Wright ed. 1958).
In Bartholf v. Baker, 71 So.2d 480, 484 (Fla. 1954), this Court discussed the invariable accusation which is leveled against a court when it determines that a jury verdict is excessive, that the court is "usurping a prerogative of the jury." We emphasized that the power of the trial judge to set aside a jury verdict is not in derogation of the right to jury trial, but is one of the historic safeguards of that right, existing to prevent the jury system itself from becoming capricious and intolerable, a power which trial courts should exercise unflinchingly.
The "broad discretion" rule should be followed by this Court. It preserves the historic discretion vested in our trial courts to properly administer justice because they are "better positioned than any ... person fully to comprehend the processes by which the ultimate decision of the triers of fact, the jurors, is reached." Cloud v. Fallis, 110 So.2d 669, 673 (Fla. 1959).
I would reverse the District Court and affirm the judgment of the trial court.
SMITH, District Court Judge, concurs.
SMITH, Judge,[*] dissenting:
The Court has now effectively obliterated two of the three grounds previously available under Florida law for a new trial or remittitur on account of excessive punitive damages. Until this Court's decision in Lassitter v. Inter. Union of Operating Eng., 349 So.2d 622 (Fla. 1976), it was understood that trial courts are empowered to grant a new trial, upon a refusal of remittitur, (1) when the punitive damage verdict tends to bankrupt the defendant and results in economic castigation; or (2) when the tort committed lacked the outrageousness required to sustain the amount of the verdict; or (3) when the punitive damage verdict bears no reasonable relation to the compensatory damages awarded. Canty v. Wackenhut Corp., 311 So.2d 808, 809 (Fla. 3d DCA 1975), and cases cited.
Those are uncertain standards all, deserving of reformation. But the Court chooses not to reform or replace those standards of restraint, but simply to obliterate them one by one; and the judicial system is deprived of its only means, developed by the law's best efforts over the years, for disciplining an essentially arbitrary system of awarding punitive damages. Until we are prepared to make a better effort to bring rational restraint to bear, I would not cast away, as entirely insignificant or unsatisfactory, a trial judge's reluctant conclusion that the jury's award is on its face so shockingly excessive as to indicate jury passion.[1] That, plainly, is the result of this decision.
Lassitter dissolved the third stated ground for trial court interception of excessive punitive damage awards, that "an award of punitive damages must bear some reasonable relation to the actual or compensatory damages awarded." 349 So.2d at 626. The Court nevertheless reaffirmed "certain well-established rules which control a review of the question of excessiveness of a jury's verdict," and specifically approved the standard which the Court now adds to the rubbish heap:
[T]he court should decline to interfere, unless the amount is so great or small as to indicate that the jury must have found it while under the influence of passion, prejudice, or gross mistake. In order to shock the sense of justice of the judicial mind the verdict must be so excessive or so inadequate so as at least to imply an inference that the verdict evinces or carries an implication of passion or prejudice, corruption, partiality, improper influences, or the like. [349 So.2d at 627]
*442 The Court now silently overrules Lassitter. It no longer matters that the trial judge considers the punitive damage verdict so shockingly excessive "as at least to imply an inference that the verdict evinces or carries an implication of passion... ." By today's decision the "influences which aroused the passion" of the jury must be "capable of demonstration in the record or beyond the record," and they must be identified. Now, moreover, "the amount of the excess must clearly appear from the record,"[2] and presumably the amount of excessiveness must be related quantitatively to the "influences" which are so identified. Supra, at 434. That, let there be no doubt, is an illusion, an unattainable standard. In tort cases, where punitive damages have become so fashionable, there is nothing comparable to the situation in Bennett v. Jacksonville Expressway Authority, 131 So.2d 740 (Fla. 1961), in which the trial court found the just compensation verdict shockingly inadequate when compared to the condemnor's estimate attending its declaration of taking. I assume that courts will rarely accept extra-record newspaper articles, appended to an appellate brief, as satisfactory evidence of "influences" which aroused the jury's passion, let alone as evidence of "the amount of the excess." See International Union of Operating Eng. v. Lassitter, 295 So.2d 634, 639 n. 4 (Fla. 4th DCA 1974), reversed, 314 So.2d 761 (Fla. 1975), mandate conformed to, 325 So.2d 408 (Fla. 4th DCA 1975), reversed on other grounds, 349 So.2d 622 (Fla. 1976).
Of the original three, but a single ground remains for trial court intervention to order new trials on account of excessive punitive damage awards: the tendency of the award to bankrupt the defendant. That standard is a game of percentages; and, considering this Court's evident approval of punitive damages ranging up to 23 percent of a corporation's net worth, Bould v. Touchette, 349 So.2d 1181, 1187 (Fla. 1977), and cases cited approvingly, the anti-bankruptcy standard is scarce restraint. Indeed, when it stands alone, the anti-bankruptcy standard may be oddly counter-productive of societal goals. It prevents the economic dismemberment of target corporate offenders which survive to pass along the cost to the public, by insurance when that is permissible,[3] and by prices when it is not.
The Court overlooks that punitive damages are different. We treasure a jury's collective judgment because we believe it results from a process that winnows and dissipates the effect of hidden prejudices, faulty memories, and poor understanding among the six participants.[4] Ordinarily, however, we mark the boundaries and channels for this interplay by describing what in law would constitute a tort, a crime, or a breach of the contract, so that the jury may *443 collectively determine whether events occurred which constitute that tort, that crime, or that breach. When we define the occasions for punitive damages, however, we deal with such varied human experience and values that we are without a framework, beyond a general reference to types of conduct we abhor, within which the jury may work collectively to find the facts. In no case except that of punitive damages do we ask the jury to define the standard of reprehensible conduct, determine whether the defendant offended that standard, and assess the penalty.
There is a certain symmetry, an exquisite simplicity, in the Court's position that the law cannot rationally identify excessive punitive damage awards. That position perfectly mirrors the absence of any rational standard for the jury's determining the propriety and amount of those awards. In the real life of our trial courtrooms, there is, however, one identifiable standard. Because the jury's concern is whether the defendant's conduct was outrageous  whether defendant "acted with malice, moral turpitude, wantonness, willfulness or reckless indifference to the rights of others ..."[5]  the amount of punitive damages varies with the extent of the jury's outrage.[6] This decision makes jury outrage unthwartable. I find it peculiar that the Court should wish the rule of law to rest so entirely on the flashpoint of so unruly a state of mind. It is reminiscent of another time, another place, where a purpose was so fraught with passion that steadying influences could not be tolerated:
"You are consigned, Evremonde, to the prison of La Force."
"Just Heaven!" exclaimed Darney. "Under what law, and for what offense?"
The officer looked up from his slip of paper for a moment.
"We have new laws, Evremonde, and new offenses, since you were here."[7]
New laws, new offenses: Thou shalt not outrage the jury.
At every juryman's vote, there was a roar. Another and another. Roar and roar.
Unanimously voted. At heart and by descent an Aristocrat, an enemy of the Republic, a notorious oppressor of the People. Back to the Conciergerie, and Death within four-and-twenty hours!
Punitive damages are different. When we invite a jury to consider such an award, we call into play a primordial emotion, not far beneath the skin of any of us, which the law nowhere else invokes: the urge to punish. That emotion tends to burn away reason and other benign influences on the collective judgment we so highly prize in the jury system. Unlike private prejudice, faulty memory, and poor understanding, the individual's urge to punish does not dissipate in collective decision. In the anonymity of the group, and with the apparent sanction of the law, it grows stronger. See W. Clark, The Ox-Bow Incident; G. DuBois, Punitive Damages: Bonanza or Disaster?, Litigation (Journal of the Section of Litigation, American Bar Association), vol. 3, no. 1 at 35, 38 (Fall, 1976).[8]
I believe the Court tests the jury system beyond its limit by adding unrestrained penalizing *444 power to the jury's powers to fix the standard for reprehensible conduct and to try the defendant by that standard. The process cries out for a small measure of individual responsibility, which until today we have reposed in the trial judge, for sparing use in cases of rampant jury passion evidenced by the amount of punishment prescribed. I do not think review power in the trial court, so limited, is either unwholesome or unpatriotic. I think having it may save punitive damages, and a jury system to award them, from extinction. But the Court, like the gardener who cannot bear to prune, encourages wild and terminal growth.
Punitive damages are different. Lawyers must work in this maelstrom. I believe that this decision endangers the advocacy system in the same way it jeopardizes both punitive damages and the jury. By removing yet another check on passionate verdicts for punitive damages, the Court creates a vacuum into which advocates, resourceful as always, must move. I think I am among those who most admire the diligence and resourcefulness of lawyers' advocacy;[9] but, while fighting off external attacks on the advocacy system, we must vigilantly guard against systemic influences which tend to corrupt it. Unleashing punitive damage verdicts is such an influence.
A lawyer does not seek punitive damages in allegiance to a client, the potential windfall beneficiary. The lawyer is the self-appointed vindicator of the public. He or she seeks to fulfill, by toil and skill, a furious mission. To engender outrage in juries, lawyers must, perforce, be outraged. They are hunters. Moreover they are bounty hunters, for whom reward is contingent on the amount of penalty that can be extracted from a quasi-criminal. By so naming claimants' lawyers I do not disparage either them or the salutary aspects of the remedy which necessarily depends on them; nor do I overlook the heroism they daily exhibit in dealing truthfully with known facts impeding their purpose and, when called on to do so, in revealing those that would otherwise remain unknown. I say only that the hunter's state of mind, too freely indulged and rewarded, tends inexorably to polarize an important sector of the Bar and to destroy essential fellowship, trust, and civility within the profession on which our justice system ultimately depends.[10]
Wanton corporate oppressors, which operate by scheme and cover, do not naturally associate themselves with sensitive and forthright defense counsel, or they do so only out of consummate cleverness. Therefore, in the claimant's appeal to jury outrage, there is a temptation to account for a fellow lawyer as either a pawn or a co-conspirator. We occasionally encounter that phenomenon in the trial records of criminal cases, which fortunately are subject to due process and other restraints that now slip away in punitive damage cases.[11] That fratricidal tendency is evidenced by this record. In closing to the jury, following his classic argument that "if you do not punish them, the corporate executives will run the corporation like they always have," claimant's advocate paid sardonic respect to defendant's retention of "one of the largest law firms in Dade County," and he later argued:
[W]hat will cause them [the corporate executives] to change their procedures? *445 [Y]ou and your verdict and only that. Your verdict will speak the truth and walk out of here on its own merits; and then the Wackenhut Corporation with their lawyers, the largest law firm in Dade County 
On objection the trial judge instructed the jury to disregard the argument concerning defendant's lawyer.
I do not know whether this kind of veiled associational scorn is productive of punitive damages. Judging by its frequency in these cases, one would have to surmise, at least, that many claimants' advocates think so. I do say unhesitatingly that, in this and other ways that could be mentioned, the quest for punitive damages severely tests the fellowship of the Bar. For that further reason, I regret the removal of the last meaningful impediment to assuaging excessive outrage with excessive punitive damages.
The courts of nearly all other jurisdictions have long retained, for sparing use, power to remedy punitive damage verdicts that are found so shockingly excessive as to indicate jury passion, or which fall under similar rubrics.[12] Yet, if that is considered too uncertain a standard for Florida, there are alternatives. One which has found favor ordinarily limits the punitive assessment to an amount necessary to compensate claimant for his non-taxable litigation costs, including attorney's fees, and for his other measurable trouble in vindicating the public interest.[13] General awards above that may be reserved for cases of systematic commercial fraud, evidenced by such alternative factors as repetition and concealment of the offensive conduct, complicity of a number of executives at the policy level, a deliberate choice to inflict injury of the type the claimant suffered, or especially grave consequences of a policy choice.[14] *446 This case contains none of those aggravating factors. Wackenhut did not dispatch its guard to pull Mr. Canty's colostomy bag; it negligently failed, on this occasion, to provide a bilingual guard for a store having both English- and Spanish-speaking patrons. I cannot but wonder if an Anglo jury would have found Wackenhut's conduct quite so reprehensible if the fluencies of guard and patron had been reversed, the guard readily understanding English only, the patron explaining his predicament in good Spanish or poor English.
Less than a year ago the Court stated, in Bould v. Touchette:
The problem of determining whether a verdict is excessive is not so subjective as to prevent the formulation of standards to be used in the exercise of the court's power. [349 So.2d at 1184.]
Today the Court leaves that covenant unfulfilled.
NOTES
[*] Of the District Court of Appeal, First District, assigned to temporary duty. Article V, Section 2(b), Constitution of Florida.
[1] Judge Turner found that the punitive damage verdict was "so grossly excessive and contrary to the evidence as to shock the conscience of the court." Though he did not add that it was the jury's evident passion that shocked his conscience, that was the thrust of it. The Court does not turn this decision on that omission.
[2] The Court's resurrection of De La Vallina v. De La Vallina, 90 Fla. 905, 107 So. 339 (1926) as authority for the quoted passage is puzzling. That opinion by Mr. Justice Terrell says also that "the excess cannot always be worked out with a mathematical precision, nor do we think the rule contemplates this"; that the excess "may be arrived at through any process of reasoning actuated and controlled by the facts in the record and guided by an honest, sincere purpose to do justice to both parties to the cause in the light of these facts"; and that when the trial court orders a remittitur to the "amount as he would not feel at liberty to pronounce excessive," as distinguished from the "amount he would have given had he been on the jury," the presumption on appeal is that the trial court did its duty. The Court thus affirmed an order granting a new trial in the absence of a remittitur of $500 of a verdict for $1,089.82, without reciting record "influences" indicating the amount of excessiveness.
[3] Sterling Ins. Co. v. Hughes, 187 So.2d 898 (Fla. 3d DCA 1966); Nicholson v. American Fire & Cas. Ins. Co., 177 So.2d 52 (Fla. 2d DCA 1965); Northwestern Nat. Cas. Co. v. McNulty, 307 F.2d 432 (5th Cir.1962). See also Annot. 20 A.L.R.3d 343 (1968).
[4] See The American Jury System (Annual Chief Justice Earl Warren Conference on Advocacy in the United States, The Roscoe Pound  American Trial Lawyers Foundation, 1977) at 18:

[S]uch studies as have been conducted in the United States suggest that judges have been both higher and lower (and somewhat more erratic) than juries in awarding damages in civil cases. This is not to criticize the judiciary, but rather to point out the difference between a collective decision and that of a single person.
[5] Fla.Std.J.Instr. (Civ.) 6.12.
[6] See D. Owen, Punitive Damages in Products Liability Litigation, 74 Mich.L.Rev. 1257, 1320 n. 304 (1976):

An overlooked twist of irony exists within the law of punitive damages. According to traditional learning, the jury cannot award such damages unless it concludes that the defendant's conduct was "outrageous." See Restatement (Second of Torts § 908(2) (Tent. Draft. No. 19, 1973)). But outrage is undoubtedly an emotion of passion and, therefore, if the jury is outraged by the defendant's conduct the verdict will have to be reversed as the product of passion. See, e.g., C. McCormick, [Law of Damages ch. 10 (1935)] at 296. Thus the basis for punitive damages comes perilously close to being the basis for their reversal as well.
[7] C. Dickens, A Tale of Two Cities, Book 3, Ch. 1, 10.
[8] Mr. DuBois, citing published psychological studies, argues that "the urge or willingness of one human being to punish another can be irresistible in circumstances where the opportunity is reinforced by an institution of society, such as the jury system."
[9] State ex rel. Gentry v. Fitzpatrick, 327 So.2d 46, 47 (Fla. 1st DCA 1976).
[10] I do not overlook the tendency to increase our expectations of the responsible lawyers when we broaden a remedy. See the otherwise humorous remarks of Warren Goodrich, Esquire, in Journal of the Academy of Florida Trial Lawyers, No. 187, p. 5 (April 1978):

Can P.D. [punitive damages] go undiagnosed and what are the consequences? Yes, some lawyers are overlooking the possibility of P.D. and could be subjected to a malpractice claim as a result of such oversight.
[11] See Cochran v. State, 280 So.2d 42, 43 (Fla. 1st DCA 1973) (prosecutor's argument about "how defense lawyers operate"); Simpson v. State, 352 So.2d 125, 126 (Fla. 1st DCA 1977) (prosecutor's reference to "one of the favorite tricks of a defense lawyer"); Carter v. State, 356 So.2d 67 (Fla. 1st DCA 1978) (prosecutor's argument that "[s]he's been appointed to be the defendant's mouthpiece... . It's almost criminal sometimes the extent these people go to ... to represent these criminals").
[12] Trahan v. Cook, 288 Ala. 704, 265 So.2d 125 (1972); Nielson v. Flashberg, 101 Ariz. 335, 419 P.2d 514 (1966); Vogler v. O'Neal, 226 Ark. 1007, 295 S.W.2d 629 (1956); Schroeder v. Auto Driveway Co., 11 Cal.3d 908, 114 Cal. Rptr. 622, 523 P.2d 662 (1974); Ark Valley Alfalfa Mills, Inc. v. Day, 128 Colo. 436, 263 P.2d 815 (1953); Riegel v. Aastad, 272 A.2d 715 (Del. 1970); Jones v. Spindel, 128 Ga. App. 88, 196 S.E.2d 22 (1973); Lou Leventhal Auto Co., Inc. v. Munns, 328 N.E.2d 734 (Ind. App. 1975); Northrup v. Miles Homes, Inc. of Iowa, 204 N.W.2d 850 (Iowa 1973); Sweaney v. United Loan and Finance Co., 205 Kan. 66, 468 P.2d 124 (1970); Hensley v. Paul Miller Ford, Inc., 508 S.W.2d 759 (Ky. 1974); Oppenhuizen v. Wennersten, 2 Mich. App. 288, 139 N.W.2d 765 (1966); Pisha v. Sears, Roebuck & Co., 496 S.W.2d 280 (Mo. App. 1973); Nevada Cement Co. v. Lemler, 89 Nev. 447, 514 P.2d 1180 (1973); Cabakov v. Thatcher, 37 N.J. Super. 249, 117 A.2d 298 (1955); Galindo v. Western States Collection Co., Inc., 82 N.M. 149, 477 P.2d 325 (1970); Stone v. Hotel Roosevelt Corp., 7 A.D.2d 843, 181 N.Y.S.2d 561 (1959), see also James v. Powell, 26 A.D.2d 525, 270 N.Y.S.2d 789 (1966), rev'd on other grounds, 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967); Southwestern Greyhound Lines, Inc. v. Rogers, 267 P.2d 572 (Okl. 1954); Int'l Electronics Co. v. N.S.T. Metal Prod. Co., Inc., 370 Pa. 213, 88 A.2d 40 (1952); Conti v. Walter Winters, Inc., 86 R.I. 456, 136 A.2d 622 (1957); Patterson v. Bogan, 261 S.C. 87, 198 S.E.2d 586 (1973); Baumgartner's Electric Const. Co. v. DeVries, 77 S.D. 273, 91 N.W.2d 663 (1958); Klein v. Elliott, 59 Tenn. App. 1, 436 S.W.2d 867 (1968); Bank of North America v. Bell, 493 S.W.2d 633 (Tex.Civ.App. 1973); Kesler v. Rogers, 542 P.2d 354 (Utah 1975); Spencer v. Steinbrecher, 152 W. Va. 490, 164 S.E.2d 710 (1968); Meke v. Nicol, 56 Wis.2d 654, 203 N.W.2d 129 (1973); Petsch v. Florom, 538 P.2d 1011 (Wyo. 1975); Nodak Oil Co. v. Mobil Oil Corp., 533 F.2d 401 (8th Cir.1976); Natco, Inc. v. Williams Bros. Eng. Co., 489 F.2d 639 (5th Cir.1974).
[13] E.g., Afro-American Pub. Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649 (1966); Burgess v. Williamson, 506 F.2d 870 (5th Cir.1975); Jolley v. Puregro, Inc., 94 Idaho 702, 496 P.2d 939 (1972); Triangle Sheet Metal Works, Inc. v. Silver, 154 Conn. 116, 222 A.2d 220 (1966).
[14] See Owen, supra n. 5 at 1319, where these factors are suggested for punitive damages in products liability cases: "(1) the amount of the plaintiff's litigation expenses; (2) the seriousness of the hazard to the public; (3) the profitability of the marketing misconduct (increased by an appropriate multiple); (4) the attitude and conduct of the enterprise upon discovery of the misconduct; (5) the degree of the manufacturer's awareness of the hazard and of its excessiveness; (6) the number and level of employees involved in causing or covering up the marketing misconduct; (7) the duration of both the improper marketing behavior and its coverup; (8) the financial condition of the enterprise and the probable effect thereon of a particular judgment; and (9) the total punishment the enterprise will probably receive from other sources."