IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

SAIRA HASHMI-ALIKHAN, M.D., HEALTH
FIRST, INC., HEALTH FIRST PHYSICIANS
GROUP, INC., CAPE CANAVERAL
HOSPITAL, INC. AND CAPE CANAVERAL
HOSPITAL FOUNDATION, INC.,

        Appellants,

v.                                   Case No.  5D16-3735

GERALDINE J. STAPLES, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
GLENN STAPLES, RANDALL B. RIGDON,
M.D., RANDALL B. RIGDON, LLC, DANIEL
J. CALABRESE, P.A., FIRAS R. MUWALLA,
M.D., ET AL.,

        Appellees.

_____/

Opinion filed March 29, 2018

Appeal from the Circuit Court
for Brevard County,
George W. Maxwell III, Judge.

Wilbert R. Vancol and Mary Jaye Hall, of
McEwan, Martinez, Dukes & Hall, P.A.,
Orlando, for Appellants.

Christopher V. Carlyle, of The Carlyle
Appellate Law Firm, Orlando, for Appellee
Geraldine J. Staples, as Personal
Representative of the Estate of Glenn
Staples.

No Appearance for Remaining Appellees.

EISNAUGLE, J.

Appellants, Saira Hashmi-Alikhan, M.D., Health First, Inc., Health First Physicians Group, Inc., Cape Canaveral Hospital, Inc., and Cape Canaveral Hospital Foundation, Inc., appeal the trial court's order granting a new trial in favor of Appellee, Geraldine Staples, as Personal Representative of the Estate of Glenn Staples, based upon the finding that the jury's verdict was contrary to the manifest weight of the evidence. In its order, the trial court concluded that Appellants' expert witnesses "gave more general opinions, and were not as knowledgeable to the hematological intricacies of the case." We reverse because the record does not support the trial court's reasons for granting a new trial.

Appellee's husband, Glenn Staples, a sixty-year-old male, presented to the emergency room at Cape Canaveral Hospital at 5:00 p.m. on February 9, 2010, with a platelet count of 1000. A platelet count of 10,000 is considered critically low, a normal count is about 250,000 for a sixty-year-old. At such a low platelet count, life-threatening and organ-threatening bleeds are a concern because the human body cannot adequately form blood clots with so few platelets. By 7:30 p.m., Mr. Staples was diagnosed with acute immune (or idiopathic) thrombocytopenia purpura ("ITP"), a blood disorder that required treatment to halt his body's destruction of platelets.

Mr. Staples' treating physician, Dr. Alikhan, examined Mr. Staples and consulted with Dr. Muwalla, an on-call hematologist, to assist in managing her patient's rare blood disorder. Dr. Muwalla elected to return to the hospital to personally examine Mr. Staples. At Dr. Muwalla's recommendation, Dr. Alikhan ordered that Mr. Staples receive

2

prednisone, a corticosteroid, and intravenous immunoglobulin ("IVIG"), to treat Mr. Staples' ITP. Dr. Alikhan did not order a platelet transfusion for Mr. Staples, and Dr. Muwalla only recommended a platelet transfusion in the event of a "life-threatening hemorrhage."

Mr. Staples was admitted to the hematology floor of the hospital at 8:40 p.m. His nurse commenced administering IVIG at 10:20 p.m.; however, he experienced an adverse reaction to the IVIG within fifteen minutes (sweating and vomiting), so the nurse discontinued the IVIG and notified Dr. Muwalla. Dr. Muwalla ordered the nurse to restart the IVIG as soon as Mr. Staples stabilized. Around midnight, the nurse called Dr. Muwalla again to report on her inability to restart the IVIG due to Mr. Staples' continuing condition. In response, Dr. Muwalla ordered the nurse to discontinue the IVIG. The nurse conceded she never administered the ordered prednisone to Mr. Staples. The following morning at 5:37 a.m., Mr. Staples was found unresponsive and without a pulse, which was about twelve and a half hours after he presented to the emergency room. Although efforts to resuscitate Mr. Staples were partially successful, he was significantly compromised, never regained consciousness, and was declared brain dead at 9:45 a.m. A CAT scan of Mr. Staples' brain showed a catastrophic intracerebral hemorrhage, and he was pronounced dead at 4:16 p.m. His cause of death was acute cerebral hemorrhage from thrombocytopenia.

During a two-week jury trial, the parties presented expert testimony on the standard of care applicable to Dr. Alikhan, Dr. Muwalla, and the nurse who administered the IVIG. Appellee offered expert testimony that Mr. Staples' condition was treatable, and that Dr. Alikhan and Dr. Muwalla breached the standard of care by (1) failing to order that

3

the IVIG be administered at a reduced rate initially to reduce the risk of an adverse reaction, (2) failing to order both IVIG and prednisone "stat,"[1] and (3) failing to order a platelet transfusion for Mr. Staples. On the other hand, Appellants offered expert testimony that (1) all three health care professionals met the standard of care, and (2) given Mr. Staples' extreme condition, there was nothing that could have saved his life.

Importantly, although a great deal of the evidence and argument at trial pertained to IVIG and prednisone, the experts on both sides agreed that IVIG and prednisone take at least twenty-four hours to take effect, and usually longer. Therefore, given that Mr. Staples suffered a catastrophic intracerebral hemorrhage about twelve and a half hours after presenting to the hospital, and was declared brain dead about seventeen hours after presentation, the experts agreed that platelets were the only treatment that could have saved Mr. Staples' life. This testimony was uncontroverted.

The experts could not agree, however, on the propriety of ordering a platelet transfusion. Appellants' expert testified that there are medical risks to ordering platelets, and that platelets should only be ordered in the event of a life-threatening bleed, which the experts agreed Mr. Staples did not have when he was examined by Dr. Alikhan and Dr. Muwalla. In contrast, Appellee's expert opined that the only proper course of action was to order platelets "stat" immediately upon Mr. Staples' admission. Appellee's expert conceded that there are medical risks associated with a platelet transfusion, but opined that the risk of not administering platelets outweighed the risks of doing so.

---

[1] The record reflects that "stat" indicates that the order should be carried out on an emergent basis.

4

The jury returned a defense verdict. In response, Appellee filed a motion for a new trial, arguing that the jury's verdict was against the manifest weight of the evidence. The trial court ultimately agreed and granted the motion. On appeal, Appellants argue that the trial court abused its discretion in granting a new trial because the record does not reflect that Appellants' expert witnesses testified only generally or that they were less knowledgeable regarding the hematological intricacies of the case. We agree.

"When a motion for new trial is made it is directed to the sound, broad discretion of the trial judge . . . ." *Cloud v. Fallis*, 110 So. 2d 669, 673 (Fla. 1959) (citations omitted). "[T]he trial judge can and should grant a new trial if the manifest weight of the evidence is contrary to the verdict." *Smith v. Brown*, 525 So. 2d 868, 870 (Fla. 1988) (citation omitted). Thus, a trial court should grant a new trial "if the jury has been deceived as to the force and credibility of the evidence or has been influenced by considerations outside the record." *Cloud*, 110 So. 2d at 673 (citations omitted). "In making this decision, the trial judge must necessarily consider the credibility of the witnesses along with the weight of all of the other evidence." *Smith*, 525 So. 2d at 870 (citation omitted). Nevertheless, the trial court may not act as a seventh juror by substituting its verdict for that of the jury, and "should only intervene when the *manifest* weight of the evidence dictates such action." *Id.*; *see also Brown v. Estate of Stuckey*, 749 So. 2d 490, 494–95 (Fla. 1999). "Not every verdict which raises a judicial eyebrow should shock the judicial conscience." *Wackenhut Corp. v. Canty*, 359 So. 2d 430, 435 (Fla. 1978) (quoting *Laskey v. Smith*, 239 So. 2d 13, 14 (Fla. 1970)).

Once on appeal, we review a trial court's order granting a new trial for an abuse of discretion. *Smith*, 525 So. 2d at 870. "If reasonable men could differ as to the propriety

of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion." *Baptist Mem'l Hosp., Inc. v. Bell*, 384 So. 2d 145, 146 (Fla. 1980) (citation omitted). Moreover, "[t]he fact that there may be substantial, competent evidence in the record to support the jury verdict does not necessarily demonstrate that the trial judge abused his or her discretion." *Brown*, 749 So. 2d at 498. Indeed, "[t]he trial judge's discretion permits the grant of a new trial although it is not clear, obvious, and indisputable that the jury was wrong." *Id.* at 497 (internal marks omitted).

That said, a trial court's discretion is not unbridled, even in the context of a motion for new trial. *Wackenhut*, 359 So. 2d at 434. For instance, it is well-settled that a trial court abuses its discretion when its reasons for granting a new trial are not supported by the record. *Id.* at 435–36. "Consequently, to facilitate intelligent appellate review of such orders the reasons which produced the need for the new trial must be set forth in the order." *Id.* at 434 (citation omitted); *see also* Fla. R. Civ. P. 1.530(f); *Baptist Mem'l Hosp.*, 384 So. 2d at 146.

Here, the trial court abused its discretion because its reasons for granting a new trial are not supported by the record. The pertinent portion of the order granting a new trial states:

> The Court finds that the Plaintiff's expert witnesses were clearly more credible than the Defendants' expert witnesses. Plaintiff's experts concisely "zeroed in" on the relevant facts of the case and applied those facts to the standards of care applicable to the health care providers. On the other hand, Defendants' experts gave more general opinions, and were not as knowledgeable to the hematological intricacies of the case.

We have reviewed the expert testimony at trial and find no support for the trial court's conclusion that Appellee's experts "zeroed in" on the relevant facts of the case any more

6

than Appellants' experts. Nor did Appellants' experts give more general opinions or demonstrate less knowledge of the "hematological intricacies of the case."

Although the parties spent considerable time on whether IVIG and prednisone were administered properly, according to the undisputed record evidence, the case turned on whether Mr. Staples' treating physicians should have ordered a platelet transfusion. Mr. Staples coded and remained in an unresponsive state about twelve and a half hours after admission to the hospital. The evidence was undisputed that IVIG and prednisone do not take effect for at least twenty-four hours. Thus, IVIG and prednisone were irrelevant to the cause of Mr. Staples' death, and Appellee's hematologist conceded as much when he testified that only platelets could have saved Mr. Staples' life.

The order granting a new trial is an abuse of discretion as to the nurse who cared for Mr. Staples because she could not have caused Mr. Staples' death. While there was disputed evidence at trial as to whether she met her standard of care in the administration of IVIG and prednisone, the evidence was undisputed that this could not have caused Mr. Staples' death. Moreover, Appellee presented no evidence that the nurse had any authority to order platelets, let alone that she fell below the standard of care for a nurse in failing to do so.

The order granting a new trial is also an abuse of discretion as to Mr. Staples' treating physicians. On the critical issue of platelets, Appellants' expert hematologist testified at length and in significant detail. Contrary to the trial court's reasons for granting a new trial, he applied his opinions on the standard of care and causation regarding

platelet transfusions directly to Mr. Staples' condition, and demonstrated a thorough knowledge of the hematological intricacies of the case.[2]

We readily acknowledge that Appellants' expert hematologist was unable to answer, based on his memory, some detailed factual questions about the case during cross-examination. However, counsel's questions were either unimportant or irrelevant to the expert's hematological opinions. While this effort to discredit an expert by testing his memory regarding factual minutia in the case may be a permissible trial tactic, it does not demonstrate that an expert lacks knowledge of the "hematological intricacies of the case." At most, it demonstrates that Appellants' expert hematologist did not prepare to answer questions that were unnecessary to support his proffered opinions.[3]

Therefore, we reverse the order granting a new trial with instructions to reinstate the jury's verdict.

REVERSED and REMANDED.

PALMER and EVANDER, JJ., concur.

---

[2] Even if the IVIG and prednisone treatments were relevant to causation here, we would nevertheless conclude that the trial court abused its discretion because Appellants' experts did not offer "more general opinions" as to those issues and were not less knowledgeable in rendering their respective opinions.

[3] We note that Appellee's hematologist was likewise unable to answer some questions on cross-examination.