STEVEN R. RAND, Respondent, v NEW YORK TIMES COMPANY et al., Defendants, and JANIS IAN, Appellant.

First Department, July 3, 1980

## APPEARANCES OF COUNSEL

*Joel H. Weinstein* of counsel *(Abeles Clark & Osterberg,* attorneys), for appellant.

*David S. Weiss* of counsel *(Harry I. Rand* with him on the

brief; *Botein, Hays, Sklar & Herzberg,* attorneys), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

At issue in this libel action is whether the alleged defamation is, as its author contends, an expression of pure opinion and thus not actionable.

Janis Ian is a singer and composer who was interviewed for an article which appeared in the magazine section of the Sunday *New York Times* on February 15, 1976. The subject of both the interview and the article was Phoebe Snow, also a singer and composer. Plaintiff Steven Rand, the former manager of Snow, alleges that defamatory matter appearing in the article, *inter alia,* held him up to public contempt, scandal and disgrace, and injured his standing in the entertainment industry and the legal profession, of which he is a member. The material with which plaintiff has taken umbrage is contained in a paragraph that revolved around a quotation from Ian: "She [Phoebe Snow] is also paranoid. 'Phoebe's had harder times than anybody I've ever met—in terms of now—in the business,' Janis Ian declares hotly. 'Her record company and her manager and her lawyer all screwed her at once.' Phoebe herself will not discuss these issues, claiming to be in the midst of a number of expensive and enervating lawsuits. Because of them and what she might be held liable for saying, the singer is awash with secrets and taboo subjects for journalists." The alleged libel appears in the remark, "Her record company and her manager and her lawyer all screwed her at once." Unmistakably, plaintiff alleges, he is the person designated as "her manager." He has brought this action against Ian as well as the New York Times Company and Stephen Rubin, the publisher and author, respectively, of the article. Neither the *Times* nor Rubin is a party to this appeal.

At an earlier stage in the litigation, the *Times* and Rubin moved for dismissal. (CPLR 3211, subd [a], par 7.) Special Term (RICCOBONO, J.), finding the remark quoted in the article actionable as a "mixed opinion", denied the motion. Ian subsequently moved for summary judgment pursuant to CPLR 3212, claiming that her remark was a constitutionally protected expression of opinion. As part of the moving papers she attached a transcript of the full interview with Rubin, which

did not appear in the *Times'* article and which, because of its relevancy to the issues, we repeat in its entirety:

"IAN: She had real hard times.

"RUBIN: And I drive her crazy, so,

"IAN: I mean she's had harder times than,

"RUBIN: She's had it rough, rough.

"IAN: Well, she's probably had a rougher time than anybody I've ever met in the business, you know, in terms of now, in terms of rock n' roll folk, you know, not in terms of Victoria Spivey, but in terms of somebody signing a record contract and getting that f----d over, I mean, when your record company and your lawyer and your manager all f--- you over at once.

"RUBIN: Surely to talk about it now, I have to guess so.

"IAN: She's right, she's right.

"RUBIN: Yea, she's right, and *Rolling Stone* did a long great piece on her that went on so long about that thing that its just boring already, but . . .

"IAN: Yea.

"RUBIN: The *Times* is going to be after my ass to do it, and I don't even have all the details on it.

"IAN: You got to understand what happened was, she cut this record, this guy said sign this contract, and she was a jerk, she signed the contract and that's her fault.

"RUBIN: Umm.

"IAN: And then she cut this record and the record was a hit and they put her on the road, but they put her on the, I mean, to take somebody who's never been on the road and put them on the road without a competent road manager, I mean Phoebe was paying the band herself at the end of every week, you know, it's not something, she was doing the plane reservations. It's not something that somebody like her knows how to do in the first place, much less should have to do on the road, and uh, she didn't know which end was up, I mean she had no sound company, she had no light company, they would drive 7-8 hours, now she was making enough bucks on that not to have to drive.

"RUBIN: Uh huh.

"IAN: And they put her out for 50 one-nighters.

"RUBIN: Yea, she gave me some of that, some of that

travelling sounded just like, uh, I was stunned. She was crazy to do it.

"IAN: Yea.

"RUBIN: Yea, but you do it, You do it.

"IAN: So, I mean, there was no routing, there wasn't jack s--t, you know, and by the end of it, she hated herself, she hated the road, she hated her singing and her songs.

"RUBIN: And they hated each other, they all hated one another.

"IAN: Of course.

"RUBIN: She said it would be somebody's turn one week and they would all just run.

"IAN: Sure, scattered. So, and you know, that's being f----d over to me because the manager's job with an artist is to make sure the artist doesn't have to do that kind of stuff.

"RUBIN: Otherwise there's no reason to have a manager. You can book yourself into plenty of places and,

"IAN: Sure, you can sit down and make phone calls.

"RUBIN: On the phone and make phone calls also,

"IAN: Sure, she got f----d over that way".

■ Special Term, apparently of the view that the disposition of the earlier *Times*- Rubin motion was controlling, denied Ian's motion, noting that the only distinction in her statement between the transcript of the interview and as it appeared in the *Times'* article was the substitution of the euphemism "screwed" for the vulgarism originally used by Ian. In our opinion the legal distinction between Ian's remark as originally rendered and as published, turned not on the substitution of a euphemism but, rather, on the context in which the remark is initially found. As shown by the transcript of the interview, Ian's remark was originally supported, whether fairly or not, by a statement of facts, while, as published, it appears by itself. The failure to note this distinction led Special Term to an erroneous determination which, on this appeal from the denial of Ian's motion, we reverse.

The laws against defamation are designed to prevent the imparting of misinformation about individuals, not the open interchange of ideas. "Under the First Amendment there is no such thing as a false idea." *(Gertz v Robert Welch, Inc.,* 418 US 323, 339.) The distinction between a statement of fact and an expression of opinion is that the former can be true or

false, while the latter can be neither. (See 1 Harper & James, The Law of Torts, § 5.8, p 370.) An "erroneous statement of fact is not worthy of constitutional protection". *(Gertz v Robert Welch, Inc.,* 418 US, at p 340.) On the other hand "Opinions, false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions, providing that the facts supporting the opinions are set forth." *(Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 380; see, also, *Buckley v Littell,* 539 F2d 882, 893, cert den 429 US 1062; Restatement, Torts 2d, § 566.)

■ Only when the derogatory opinion is a "mixed opinion", that is, it is issued upon a concealed set of facts which the speaker implies would confirm his opinion, is it actionable. *(Hotchner v Castillo-Puche,* 551 F2d 910, 913.) Even then, the action arises not out of an erroneous opinion, but rather upon the false assertion, implied or explicit, that the speaker is privy to certain facts, unknown to his general audience, which are supportive of the opinion and detrimental to the person about whom the opinion is expressed. (See *Hotchner v Castillo-Puche,* 551 F2d, at p 913.) According to the Restatement (Torts 2d, § 566, comment *b,* p 172) a mixed opinion "is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication." It differs from pure opinion which is "[a] simple expression of opinion based on disclosed or assumed nondefamatory facts". (Restatement, Torts 2d, § 566, comment *c,* at p 173.)

■ Recognizing the impenetrability of the immunity that shelters the factually supported opprobrious opinion, plaintiff argues that the facts stated by Ian, even if true, fail to support her conclusion that, as Snow's business manager, he "f- - - -d over" his client. Thus, plaintiff contends, Ian's remark, even in its original context, is, at best, a factually unsupported opinion, and constitutes, like its published counterpart, a "mixed opinion", which, if defamatory, is actionable. This argument fails to recognize that the essence of pure opinion is the insulation of the author from civil suit "no matter how unjustified or unreasonable the opinion may be or how derogatory it is." (Restatement, Torts 2d, § 566, comment *c,* at p 173.)

■ ■ The phrase "f- - - -d over", as used by Ian, or "screwed", its relatively sanitized substitute, is no more than rhetorical hyperbole, and, as such, is not to be taken literally.

(See *Time, Inc. v Johnston,* 448 F2d 378; also, *Curtis Pub. Co. v Birdsong,* 360 F2d 344.) Either has connotations of one person taking advantage of another. In any event, Ian's remark to Rubin about Snow's manager is classically pure opinion, and thus not actionable, no matter how derogatory her description of his managerial talents, or tenuous the connection between supporting facts and conclusion. Even though the basis of Ian's opinion was not included in the *Times'* article, she had clearly and emphatically conveyed to Rubin the facts upon which she relied as the basis for her unflattering description of Snow's manager. She charted a pattern whereby Snow, the artist, had to take care of business arrangements which Ian believed should have been his responsibility. Ian gave examples, including the playing of 50 one-nighters and the manager's failure to provide a competent road manager, as a result of which Snow had to make her own plane reservations, book sound and light companies, and spend seven to eight hours driving to engagements. Clearly, whether stated truthfully or falsely, these facts were used to justify Ian's low opinion of Snow's manager, and are especially significant since Ian is a singer and composer with a presumed insight into an artist's relationship with her manager and an appreciation of the rigors of doing "one-nighters". But even more significantly, at one point in the interview Ian specifically stated "So, and you know, that's being f- - - -d over to me because a manager's job with an artist is to make sure the artist doesn't have to do that kind of stuff." For emphasis she subsequently reiterated her point "Sure, so she got f- - - -d over that way".

We cannot avoid noting that, although plaintiff has not sued for the falsity of the facts stated by Ian in support of her opinion of Snow's manager, his opposing affidavit at Special Term was devoted exclusively to a pointed rebuttal of each of those statements. If the alleged facts which are stated as the basis of the opinion are false, Ian, although immune for the expression of the opinion, would nevertheless be subject to liability for the false factual statements. (See, generally, *Gertz v Robert Welch, Inc., supra,* 418 US, at p 342; Restatement, Torts 2d, § 566. Comment *c,* at p 175.)

Plaintiff also argues that even if the facts stated by Ian support the derogatory opinion, she should reasonably have foreseen that the opinion alone might be repeated in the *Times'* article. In effect, plaintiff attempts to charge Ian with

the editing and excerpting of her statement to Rubin. We fail to see how she can be accountable for the editorial judgment to excise the opinion from the context in which it was given. Although an individual may not escape liability when a defamatory statement he makes is foreseeably republished (see *Campo v Paar,* 18 AD2d 364; *Weston v Weston,* 83 App Div 520; *Valentine v Gonzalez,* 190 App Div 490), he cannot be liable for the republication of a derogatory but constitutionally protected opinion when the foundation upon which that opinion is based is omitted. The defamatory remark should be "read against the background of its issuance". (See *Mencher v Chesley,* 297 NY 94, 99; also, *James v Gannett Co.,* 40 NY2d 415, 420.)

From the foregoing, it is apparent that the complaint against Ian must be dismissed, although one further consideration remains. A motion for summary judgment searches the record (see CPLR 3212, subd [b]; *Wiseman v Knaus,* 24 AD2d 869), and we are on notice that the factual basis for the expression of the derogatory opinion may be false. Ordinarily, in such circumstances, it would be appropriate to grant summary judgment, which is the equivalent of a determination after trial (see *Falk v Goodman,* 7 NY2d 87, 91), and grant leave to replead a cause of action against Ian based on the falsity of the supporting factual statements. Such a course is not warranted here, however, since any action which plaintiff might have had against Ian for the utterance of false statements in support of the opinion expired one year after her interview with Rubin. (See CPLR 215, subd 3.) In an action for slander the Statute of Limitations runs from the time of the utterance, not the discovery of the slanderous matter. (See *Bradick v Deetjen,* 118 NYS2d 256.) While every repetition of a defamatory utterance gives rise to a separate cause of action (see 2 Seelman, The Law of Libel and Slander in the State of New York [rev ed], ch 11, par 59; also, *Fleischer v Institute for Research in Hypnosis,* 57 AD2d 535), as does every distinct publication of libelous matter *(Woodhouse v New York Evening Post,* 201 App Div 9, 11; see, also, *Cook v Conners,* 215 NY 175, 180), plaintiff fails to show that the alleged factual supporting statements have been either repeated or republished.

Accordingly, the order, Supreme Court, New York County (HUGHES, J.), entered July 6, 1979, denying defendant Ian's

motion for summary judgment, should be reversed, on the law, with costs and disbursements, and the motion granted.

FEIN, J. P., SANDLER and BLOOM, JJ., concur.

Order, Supreme Court, New York County, entered on July 6, 1979, reversed, on the law, and the motion for summary judgment dismissing the complaint granted. Defendant-appellant shall recover of plaintiff-respondent $75 costs and disbursements of this appeal.