484 So.2d 603 (1986)
Gabriel ZAMBRANO, Appellant/Cross Appellee,
v.
Jegadees D. DEVANESAN, M.D., and Mona Devanesan, M.D., Appellees/Cross Appellants, and
Devanesan & Zambrano, M.D., P.A., Appellee.
No. 83-2685.
District Court of Appeal of Florida, Fourth District.
January 22, 1986.
Motions for Clarification, Rehearing and Certification Denied March 26, 1986.
*604 Terence J. Watterson and Cort A. Neimark of Watterson & Dickenson, P.A., West Palm Beach, for appellant/cross appellee.
Larry Klein of Klein & Beranek, West Palm Beach, for appellees/cross appellants.
HURLEY, Judge.
This appeal arises from a defamation action instituted by Dr. Zambrano after he allegedly was slandered during a medical staff meeting. The jury found in favor of Dr. Zambrano but, upon motion by the defendants, the trial court granted a remittitur as to compensatory and punitive damages. We affirm in part and reverse in part.
Dr. Zambrano was engaged in the practice of medicine with Dr. Jegadees Devanesan. Defendant Mona Devanesan, the wife of Jegadees Devanesan, is also a physician who maintains a separate practice. Zambrano and Jegadees Devanesan, both surgeons, began their partnership in July of 1980. Both were members of the staff at Hendry General Hospital in Clewiston and, consequently, both had staff privileges there. Mona Devanesan was also a staff member at the hospital and had similar privileges and duties. As part of their obligation to the hospital, Zambrano and Jegadees Devanesan were required to be on-call for the hospital emergency room. This required their availability on a twenty-four hour basis for emergency patients who did not have a personal physician. The on-call schedule for each month was prepared by the hospital's chief of staff, Dr. Shupe. Zambrano and Jegadees Devanesan, in turn, would make arrangements *605 between themselves to meet their on-call obligations.
In the course of their practice, both physicians applied for staff privileges at a second hospital. Jegadees Devanesan was granted privileges first, in December of 1980. Zambrano was awarded similar privileges two months later. Jegadees Devanesan's receipt of privileges carried with it an obligation to be on-call at the second hospital. Consequently, he devised a new schedule for himself and Zambrano, whereby each would handle an equal number of on-call days. Devanesan's schedule contained the sum of the on-call days for both hospitals and he proposed that the total figure be split equally, even though Zambrano had not yet received privileges at the second hospital. Zambrano declined to accept this proposal. He concluded that the revised schedule required him to cover most of Devanesan's on-call obligations at Hendry as well as his own, with no attendant benefits for Zambrano at the second hospital. When the two physicians were unable to resolve their differences, they decided to terminate their partnership in early January of 1981.
As a result of this decision, Zambrano lost the use of a house which the two doctors had used as a temporary residence while on-call. Therefore, Zambrano asked the hospital's chief of staff, Dr. Shupe, to relieve him of his on-call duties for the month of January. Shupe agreed to rearrange the schedule and told Zambrano not to worry. Zambrano also sought to have his regular staff privileges converted to consulting staff privileges, and this request was granted during the regular January meeting of the Hendry Hospital's medical staff. Neither of the Devanesans were present during this meeting.
The Devanesans, however, did attend the February staff meeting and made certain statements which gave rise to the present suit. The February meeting was not transcribed, but the participants later testified about what occurred. According to the testimony at trial, the Devanesans stated that Zambrano had neglected his practice and abandoned his obligations. Further, they said that Zambrano had deserted his responsibilities and duties; that he had walked away from his private practice, and his hospital on-call schedule, without prior notice; and that he had acted in an unprofessional and unethical manner.
At the conclusion of their remarks, Mona Devanesan made a motion to withdraw all of Zambrano's staff privileges. The motion was seconded and passed on a vote of five in favor, none opposed, and one abstention. The testimony at trial revealed that not everyone present during this meeting knew all of the facts underlying the controversy. For example, one physician, Dr. Khanna, testified that he had based his vote to revoke Zambrano's privileges solely on the information presented by the Devanesans, and that the information had been presented as fact, not opinion. Khanna also said that he would not have voted as he did if all of the facts had been presented, viz., that Zambrano had given advance notice and made arrangements with the hospital's chief of staff to cover the days for which he had been scheduled for on-call duty. This information apparently never surfaced at the meeting. Interestingly, both Devanesans testified that they considered this information irrelevant, and Jegadees Devanesan testified that he had no knowledge that Zambrano had made prior arrangements with Dr. Shupe, the chief of staff, until Dr. Shupe took the stand and testified at trial.
In any event, Zambrano's hospital privileges were never actually revoked. The staff's recommendation to revoke his privileges was not accepted by the Hospital Authority. During the March 1981 staff meeting at the hospital, there was further discussion on the matter, including additional comments by Jegadees Devanesan. At the conclusion of the discussion, a motion was made to rescind the earlier decision on withdrawing Zambrano's privileges, and it passed unanimously.
Zambrano subsequently sued the Devanesans for defamation based on their statements at the staff meetings. The jury *606 awarded Zambrano $75,000 as compensatory damages and $100,000 as punitive damages. After the verdict, the Devanesans renewed their earlier motion for a directed verdict, contending that their comments were pure opinion and thus protected speech. The trial court denied the motion, concluding that the combination of the Devanesans' remarks, together with their motion at the February meeting (to rescind Zambrano's privileges) created a factual question for the jury's resolution. The court, however, did find that the damage awards were excessive and, therefore, ordered a new trial on both liability and damages unless Zambrano agreed to a remittitur reducing the compensatory damages to $7,867.50 and the punitive damages to $7,000. Zambrano declined the remittitur and initiated this appeal. The Devanesans cross appeal and challenge the lower court's ruling regarding the actionable nature of their statements.
We start with the cross appeal, wherein the Devanesans urge that their statements to the medical staff, in reference to Zambrano, were pure opinion and thus not actionable. The determination whether a statement is fact or opinion is a question of law for resolution by the court. From v. Tallahassee Democrat, Inc., 400 So.2d 52 (Fla. 1st DCA 1981), review denied, 412 So.2d 465 (Fla. 1982). Moreover, an appellate court may make the determination of opinion versus fact on review. The distinction between fact and opinion is not always easy to perceive. Thus, the law recognizes that some comments may be pure expressions of opinion whereas others may be mixed expressions of opinion. The distinction between these concepts was discussed in Hay v. Independent Newspapers, Inc., 450 So.2d 293 (Fla. 2d DCA 1984), where the court said:
Pure opinion is based upon facts that the communicator sets forth in a publication, or that are otherwise known or available to the reader or the listener as a member of the public. Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication. Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion. Pure opinion is protected under the First Amendment, but mixed opinion is not.
Hay, 450 So.2d at 295 (citations omitted).
A similar commentary appears in Rand v. New York Times Co., 75 A.D.2d 417, 430 N.Y.S.2d 271 (1980):
According to the Restatement ... a mixed opinion "is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication." It differs from pure opinion which is "[a] simple expression of opinion based on disclosed or assumed nondefamatory facts... ."
Rand, 430 N.Y.S.2d at 274 (citations omitted).
An important factor in the process of analyzing a comment is determining whether the speaker accurately presented the underlying facts of the situation before making the allegedly defamatory remarks. Where the speaker or writer presents the facts at the same time he or she offers independent commentary, a finding of pure opinion will usually result. E.g., Lampkin-Asam v. Miami Daily News, Inc., 408 So.2d 666 (Fla. 3d DCA 1981), review denied, 417 So.2d 329 (Fla.), cert. denied, 459 U.S. 806, 103 S.Ct. 29, 74 L.Ed.2d 44 (1982); Hay v. Independent Newspapers, Inc., supra. Alternatively, even if the speaker or writer does not present the facts, or does not present all of them, like comments may still justify a finding of pure opinion where the facts are already known to the audience. See From v. Tallahassee Democrat, Inc., supra. A number of cases have held that a statement which is pure opinion is such because it is tantamount to rhetorical hyperbole. Rand v. New York Times Co., supra; Tanner v. Western Publishing Co., 682 P.2d 239 (Okla. Ct. App. 1984). Conversely, where the speaker or writer neglects *607 to provide the audience with an adequate factual foundation prior to engaging in the offending discourse, liability may arise. See Madsen v. Buie, 454 So.2d 727 (Fla. 1st DCA 1984); Eastern Airlines v. Gellert, 438 So.2d 923 (Fla. 3d DCA 1983); Smith v. Taylor County Publishing Co., 443 So.2d 1042 (Fla. 1st DCA 1983).
In this case, the Devanesans said that Zambrano left his medical practice and the hospital's on-call schedule, without notice; that he neglected his practice; and that he acted in an unprofessional and unethical manner. In our view, these comments cannot be classified as pure opinion or "rhetorical hyperbole." First, the statements on their face contain factual allegations. Second, there is nothing in the record to suggest that the Devanesans presented any kind of factual background before speaking out against Zambrano. Similarly, the record does not support a finding that those present at the medical staff meeting were already aware of the underlying facts surrounding the controversy. Moreover, the Devanesans do not contend that they thought everyone knew the facts. To the contrary, Jegadees Devanesan openly admitted that he was wholly unaware of the facts surrounding Zambrano's arrangements about the hospital on-call schedule until the chief of staff testified at trial. Furthermore, Devanesan said that he and his wife considered such information irrelevant to the matter at hand. In sum, nothing in the record indicates that the Devanesans made any effort to provide a factual basis for their allegations. Indeed, other testimony indicated that the Devanesans were far from neutral commentators; they strongly asserted their allegations to the medical staff.
"In determining whether an alleged libelous statement is pure opinion, the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication." Hay v. Independent Newspapers, Inc., supra, at 295. Applying this rule to the totality of the statements made, we hold that the remarks at the very least constituted mixed opinion, and were thus actionable. In view of this finding, we see no need to address the Devanesans' contention that the trial court erred in finding their statements actionable only because the Devanesans took the additional step of making a motion to revoke Zambrano's privileges.
We turn now to Zambrano's points on appeal. First, he argues that the trial court erred in granting a remittitur, or the alternative of a new trial, as to compensatory damages. We cannot agree. Trial courts are accorded considerable discretion in ruling on motions for remittitur and/or new trial when they are of the belief that a verdict award fails to comport with the evidence. Winn-Dixie Stores, Inc. v. Robinson, 472 So.2d 722 (Fla. 1985); Canizares v. Encore, Inc., 192 So.2d 790 (Fla. 3d DCA 1966), cert. denied, 201 So.2d 549 (Fla. 1967). A large damage award, by itself, is not necessarily indicative of excessiveness or impropriety, but where an award of damages "is contrary to the manifest weight of the evidence or where it may be truly shocking to the judicial conscience or where it is indicative of prejudice or passion, a new trial may be allowed through exercise of sound discretion by the trial judge." Allred v. Chittenden Pool Supply, Inc., 298 So.2d 361 (Fla. 1974).
When a trial court grants a motion for a new trial, the court must specify its reasons. See Rule 1.530(f), Fla.R.Civ.P.; Wackenhut Corp. v. Canty, 359 So.2d 430, 435 (Fla. 1978). Here, the court fulfilled this obligation with respect to compensatory damages. Without restating those reasons, suffice it to say that we have carefully reviewed them and do not find an abuse of discretion. Consequently, we affirm this aspect of the court's action. See Winn-Dixie Stores, Inc. v. Robinson, supra; Arab Termite & Pest Control of Florida, Inc. v. Jenkins, 409 So.2d 1039 (Fla. 1982).
We reach a different conclusion, however, on the punitive damage issue. As noted, the jury awarded $100,000 as *608 punitive damages, but the trial court granted a remittitur and reduced the award to $7,000. In its order, however, the court failed to cite specific reasons for reducing the punitive damage award. Instead, the order contains an incantation of conclusory statements, viz., that the award was "excessive as a matter of law and shocked the judicial conscience and the jury must have based their award on matters outside the evidence or upon passion or prejudice." By failing to provide specific reasons for its decision, the court's order failed to comply with Rule 1.530(f), Fla.R.Civ.P., which provides in pertinent part: "All orders granting a new trial shall specify the specific grounds therefor." The purpose of this requirement was explained in Wackenhut Corp. v. Canty, supra, where the court held that
[a]lthough an order for new trial need not incant language to the effect that the verdict is against the manifest weight of the evidence or was influenced by considerations outside the record, the order must give reasons which will support one of these two conclusions so that it will be susceptible of appellate review. Orders granting motions for new trials should articulate reasons for so doing so that appellate courts may be able to fulfill their duty of review by determining whether judicial discretion has been abused.
Id. at 435 (citation omitted). The rule was restated in Arab Termite & Pest Control v. Jenkins, supra.
[A] trial judge may not substitute its judgment for that of the jury on the matter of damages and may enter an order of remittitur or new trial only when the record affirmatively shows the jury's verdict to be excessive or when the judge makes specific findings concluding that the jury was influenced by something outside the record.
Id. at 1041.
When a trial court utilizes conclusory stock phrases "without stating reasons capable of demonstration in the record (such as influences which aroused the passion and prejudice of the jury),... the District Court of Appeal [is left] to grasp at straws... ." Wackenhut Corp. v. Canty, supra, at 434. The rules of civil procedure, however, dictate the appropriate remedy. Rule 1.530(f) states in part, "If such an order is appealed and does not state the specific grounds, the appellate court shall relinquish its jurisdiction to the trial court for entry of an order specifying the grounds." Although this provision is mandatory, see Prime Motor Inns, Inc. v. Waltman, 480 So.2d 88 (Fla. 1985), it is inapplicable to the case at bar because the trial court provided a full explication for its decision on the record. Thus, relinquishment of jurisdiction would be a useless act in contravention of the principle that courts should "not ignore the substance of justice in a blind adherence to its forms." State v. Strasser, 445 So.2d 322, 323 (Fla. 1983).
The trial court explained its decision to grant a remittitur as to punitive damages in this fashion:
The reason I say [the punitive damage award] is excessive is because the intervention of the attorney calling to the attention of the committee and of the hospital that it had erred and correcting it really protected the doctor's future. Although he had been damaged and had he not done that, of course, we can not say what would or would not have happened in any kind of a review. But he was put into a position that something had to be done, and that due process, which was really violated in this case because of the way the committee acted through the urging of these two doctors, did give rise to, quote, the imposition of a punitive damage award. I can find no greater than, quote, one percent of the seven hundred thousand dollars, which would be a seven thousand dollar award for punitive damage. And that, to me, would be the only message that I could find that would, again, square with what is fair and what is just in the light of the evidence in this case, because I'm sure that there was anxiety and concern in both  in all doctors, in all three doctors, but more so with Dr. Zambrano.
*609 In fact, then, the trial court reduced the punitive damage award because Zambrano's attorney achieved damage control by moving quickly to get the hospital to reconsider the preliminary recommendation to strip Zambrano of his hospital privileges. Thus, the court reasoned that because the plaintiff successfully minimized the impact of the defendants' wrong, punitive damages should be reduced. This is erroneous for two reasons. First, it focuses on the wrong party. What Zambrano did to stem the harm wrought by the Devanesans is irrelevant to the question of punitive damages. Rather, the court should have centered its gaze on the malice and misconduct of the defendants. See Winn-Dixie Stores, Inc. v. Robinson, supra; Arab Termite & Pest Control, Inc. v. Jenkins, supra. Second, the trial court's explanation is little more than a reformulation of the old nostrum that punitive damages must bear a reasonable relation to compensatory damages. But this was expressly rejected by the supreme court in Lassitter v. International Union of Operating Engineers, 349 So.2d 622 (Fla. 1976); see also Arab Termite & Pest Control v. Jenkins, supra.
Since the order for new trial is deficient because it does not contain reference to the record in support of its conclusion that remittitur of the punitive damage award is necessary to cure the excessiveness of the punitive damage verdict (the actual basis for requiring a new trial), we have made an independent review of the record in search of support for that conclusion. We find none.
It is proper "to issue an order for new trial or remittitur when the manifest weight of the evidence shows that the amount of punitive damages assessed is out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct." Arab Termite & Pest Control, Inc. v. Jenkins, supra, at 1043. But this principle provides no justification for remittitur in the case at bar. The Devanesans sought to destroy the professional reputation of their colleague and, at the same time, to cause severe economic hardship. That they were thwarted offers little solace. Indeed, the manifest weight of the evidence firmly establishes malice and substantial misconduct. In such a case, punitive damages are to be measured "by the enormity of the offense, entirely aside from the measure of compensation of the injured plaintiff." Ibid.
An award of punitive damages may also be reduced if it is out of all proportion to the defendant's net worth. Put another way, punitive damages may be reduced where the award "bears no relation to the amount the defendant is able to pay and results in economic castigation." Wackenhut Corp. v. Canty, supra, at 436. This concept was thoroughly discussed in Bould v. Touchette, 349 So.2d 1181 (Fla. 1977), which involved a wrongful death and survivorship action with compensatory and punitive damages awarded in each action. The trial court in Bould allowed the verdicts to stand, but the district court reversed and held that the awards were grossly excessive and contrary to the law and evidence. The supreme court reversed, expressly holding that the punitive damage award, which constituted 6.2% of the defendant's net worth, was not excessive. In support of its decision, the court cited Sperry Rand Corp. v. A.T.O., Inc., 447 F.2d 1387 (4th Cir.1971), cert. denied, 405 U.S. 1017, 92 S.Ct. 1292, 31 L.Ed.2d 479 (1972), which held that a punitive damage award of $175,000 was not excessive where the defendant was shown to have a net worth of $750,000. Sperry Rand is particularly relevant to the case at bar because the Devanesans were shown to have a net worth of approximately $700,000. Thus, it cannot be said that a punitive damage award of $100,000, which would constitute approximately fourteen percent of their net worth, amounted to economic castigation. "Punitive damages should be painful enough to provide some retribution and deterrence, but should not be allowed to destroy the defendant." Arab Termite & Pest Control v. Jenkins, supra, at 1043.
Finally, we consider Zambrano's contention that the trial court, after finding *610 fault only as to damages, erred by ordering a new trial on both damages and liability in the event that Zambrano declined the remittitur. We agree. In the absence of signs indicating that the evidence as to both liability and damages is inextricably intertwined, a new trial on both issues is not warranted. See Smith v. Telophase National Cremation Society, Inc., 471 So.2d 163 (Fla. 2d DCA 1985); Jaworski v. DeWoody & Hamner, P.A., 448 So.2d 3 (Fla. 4th DCA), review denied, 456 So.2d 1181 (Fla. 1984). The record in this case is devoid of such indicia and, consequently, a new trial should be limited to the issue of damages alone.
In summary, we affirm the remittitur of compensatory damages, but reverse the remittitur of punitive damages. On remand, the plaintiff should be given an opportunity to elect between the reduced verdict or a new trial. Should the plaintiff select the latter, the new trial should be limited to the issue of damages.
Accordingly, the judgment on appeal is
AFFIRMED IN PART AND REVERSED IN PART.
HERSEY, C.J., and GLICKSTEIN, J., concur.