DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MAGGY HURCHALLA,**
Appellant,

v.

**LAKE POINT PHASE I, LLC,** and **LAKE POINT PHASE II, LLC,**
Florida Limited Liability Companies,
Appellees.

Nos. 4D18-1221 & 4D18-1632

[June 19, 2019]

Consolidated appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; William L. Roby, Judge; L.T. Case No. 43-2013-CA-001321.

Richard J. Ovelmen, Rachel A. Oostendorp, Alix I. Cohen and Dorothy Kafka of Carlton Fields Jorden Burt, P.A., Miami, Virginia P. Sherlock and Howard K. Heims of Littman, Sherlock & Heims, P.A., Stuart, Talbot D'Alemberte of D'Alemberte & Palmer, PLLC, Tallahassee, and Jamie S. Gorelick, David W. Ogden, David Lehn and Justin Baxenberg of Wilmer Cutler Pickering Hale and Dorr, LLP, Washington, DC, for appellant.

Michael J. Labbee, Ethan J. Loeb and Jon P. Tasso of Smolker, Bartlett, Loeb, Hinds & Thompson, P.A., Tampa, for appellees Lake Point Phase I, LLC, and Lake Point Phase II, LLC.

Richard Grosso of Richard Grosso, P.A., Davie, for Amici Curiae Dr. Penelope Canan and George W. Pring.

Richard Grosso of Richard Grosso, P.A., Davie, for Amici Curiae Bullsugar.org, Florida Wildlife Federation, Friends of the Everglades, and the Pegasus Foundation.

Jack Schramm Cox, Hobe Sound, for Amicus Curiae The Guardians of Martin County, Inc.

Paul M. Crochet of Weber, Crabb & Wein, P.A., St. Petersburg, for Amici Curiae First Amendment Foundation, The League of Women Voters of Florida, Florida Press Association, Florida Society of News Editors, Natural

Resources Defense Council, Sierra Club, American Civil Liberties Union Foundation of Florida, Fane Lozman, and The Brechner Center.

CONNER, J.

Maggy Hurchalla ("Hurchalla") appeals the final judgment entered after a jury found in favor of Lake Point Phase I, LLC and Lake Point Phase II, LLC (collectively, "Lake Point"), on its claim of tortious interference. Prior to trial, the South Florida Water Management District ("the District") and Martin County ("the County") were co-defendants, but the claims against them were settled. Hurchalla argues the trial court erred by: (1) improperly instructing the jury on her defense of First Amendment privilege to petition the government; (2) entering the judgment against her when the evidence was insufficient to defeat her First Amendment privilege; (3) improperly instructing the jury on her defense of common law privilege to make statements to a governmental entity for mutual and public interest; (4) entering the judgment against her when the evidence was insufficient to defeat her common law privilege; (5) denying her motion for judgment notwithstanding the verdict (contending insufficient evidence of breach, causation, and damages); (6) giving an adverse inference jury instruction; and (7) ordering her to pay attorneys' fees as a sanction. We affirm on the issues regarding the First Amendment and common law privileges and explain our analysis. We affirm as to the other issues raised without discussion.

As to the jury instructions regarding the privilege defenses, we determine there was no reversible error. As to the evidentiary arguments, we determine that the jury was presented with sufficient evidence to conclude the privileges were negated by malice on the part of Hurchalla.

*Background*

This appeal involves a 2,266-acre tract of land in Martin County ("the Property"). The previous owners of the Property planned to develop a subdivision of twenty-acre "ranchettes," for which the County issued a development order ("the Development Order") for a large segment of the Property. The Development Order allowed the owners to mine limestone from the Property. When the real estate market started to decline in 2008, the previous owners looked to sell the Property. They contacted the District about buying the Property. The Property was of value to the District because of its unique location at the intersection of three different water basins and its potential for storing, cleansing, and then conveying water to different areas. However, the District was not able to acquire the funding to purchase the Property in a timely manner. Since Lake Point

had been a contractor building on the Property for the previous owners, it "realized that there was a very economical limestone on the [P]roperty" that the company could use for its heavy highway construction business, so it purchased the Property.

Lake Point approached the District with a concept for a public-private partnership to construct a stormwater treatment project ("the Project") on the Property. After the District oversaw an in-depth due diligence investigation, Lake Point and the District entered into an agreement titled "Acquisition and Development Agreement for Public Works Project" ("the ADA") in November 2008. The ADA addressed the Project in two phases, Phase I and Phase II, based on the fact that a portion of the Property was under the Development Order. As to the Phase I parcel, mining would continue under the Development Order. As to the Phase II parcel, which was not under the Development Order, it was contemplated that Lake Point would conduct mining to create stormwater treatment facilities, but as to that parcel, mining permits would be obtained from both the Florida Department of Environmental Protection ("FDEP") and the Army Corps of Engineers ("the Corps"). The Project envisioned that excavation of limestone would create the stormwater management lakes that could be used by the District for water storage and conveyance purposes. The agreement required Lake Point to donate the Property to the District in phases over a 20-year period, as Lake Point mined limestone from the property. Because the Development Order was an encumbrance on the Property, the ADA provided that Lake Point would have the Development Order vacated as to the portions of the Phase I parcel donated to the District.

Since the County was a necessary player in accomplishing the Project, the District and the County entered into an interlocal agreement ("the Interlocal Agreement") for the Project in May 2009. The Interlocal Agreement expressly acknowledged the Project's numerous "water related benefits." Mirroring the ADA, the Interlocal Agreement required that the Development Order (authorizing mining) had to be vacated as to any portion of the Phase I parcel donated to the District. The County expressly agreed that it would take no action to otherwise create any encumbrances on the Property. The agreement also provided that until portions of the Property were donated to the District, the Development Order would remain in full force and effect.

The Interlocal Agreement also allowed Lake Point to mine limestone on the Phase II portion of the Property, if it obtained permits from both the FDEP and the Corps. Once Lake Point obtained those permits, additional permission from the County to mine the Phase II parcel was not required

3

because the Project qualified as an exempt public stormwater project. The Interlocal Agreement also provided that Lake Point would pay the County an annual monetary contribution based on the amount of limestone mined.

Over the next several years, Lake Point worked to implement the Project. Lake Point commissioned additional engineering reports to ensure the Project's success. It applied for and obtained the necessary mining permits from the FDEP and the Corps. During this time, the County monitored the Project and never identified any problems with the Project.

Hurchalla served as a Martin County Commissioner from 1974 to 1994. She has received numerous awards for her long commitment to environmental issues and had served on state and regional environmental boards and committees. When the County entered into the Interlocal Agreement in 2009, Hurchalla knew of the Project and expressed a few concerns, but took no action in protest.

In September 2012, local media published an article about a plan by Lake Point to convert the Project into one that would supply water to the City of West Palm Beach for consumptive use. The article alarmed Hurchalla. Prompted by the news article, by late 2012 Hurchalla became vehemently opposed to the Project. This was in the same time frame as the 2012 general election, which saw a change to the composition of the Board of the Martin County Commission ("BOCC") with the election of Hurchalla's good friend Anne Scott, joining another close friend, Sarah Heard on the BOCC. Hurchalla began expressing her disagreement with the Project in a series of emails sent to these close friends on the BOCC using their private email accounts; messages were also sent to the BOCC email address of Commissioner Ed Fielding. These emails encouraged the commissioners to copy and paste Hurchalla's statements and forward them in emails to the other county commissioners and county staff. Hurchalla also began giving explicit instructions in the emails to her commissioner friends as to how to stop the Project with various maneuvers.

As found by the jury, the emails resulted in the County changing course and moving to thwart, or at the least, significantly delay the Project.

In 2013, Lake Point sued the District and the County, asserting claims for declaratory relief, breach of contract, and tortious interference. In an amended complaint, Lake Point also asserted two counts against Hurchalla, individually; one for tortious interference seeking injunctive relief, the other for tortious interference seeking damages. Regarding

4

Hurchalla, Lake Point alleged that there were new members elected to serve on the BOCC, and that "[l]eading up to and in conjunction with this change in the BOCC's composition, Hurchalla started to engage in surreptitious activities targeted to interfere with Lake Point's interests." Lake Point alleged that Hurchalla scheduled and attended meetings, and also had email communications with various members of the BOCC, having a "plan to interfere with the" Interlocal Agreement and ADA. It was also alleged that Hurchalla "began making numerous false and misleading statements verbally and in writing to the BOCC, [the District] and others, outside of normal public meetings." Lake Point specifically listed in the amended complaint seven statements Hurchalla made in a January 4, 2013 email sent to all five county commissioners. Finally, Lake Point alleged that "[a]s a result of and in direct response to Hurchalla's efforts and false statements, the County and [the District] have begun breaching various obligations under the Interlocal Agreement and Development Agreement with Lake Point[.]"

The District and the County settled with Lake Point, which resulted in amendments to the ADA and Interlocal Agreement more favorable to Lake Point, and the County paid Lake Point $12 million. Lake Point abandoned its count against Hurchalla for an injunction. The only remaining count at the time of trial was against Hurchalla for damages, focusing on her alleged tortious interference with the Interlocal Agreement.

The jury returned a verdict for Lake Point, awarding $4.4 million in damages. The trial court denied Hurchalla's motion for judgment notwithstanding the verdict. Hurchalla gave notice of appeal.

*Appellate Analysis*

Hurchalla argues that the trial court improperly instructed the jury on her First Amendment privilege to petition her government and her common law privilege to make statements to a political authority regarding matters of public concern. Additionally, she argues the evidence presented to the jury was insufficient to defeat both privileges. We first address the arguments regarding the jury instructions.

*Jury Instructions Regarding the Privilege Defense*

On appeal, Hurchalla asserts the trial court erred in instructing the jury on her defense under the First Amendment privilege to petition her government and her defense under the Florida common law to make statements to a political authority regarding matters of public concern.

5

Our review of the trial transcript reveals that most of defense counsel's charge conference arguments focused on legal principles regarding the common law privilege. However, there were times when defense counsel would infuse arguments about the First Amendment privilege, thus blurring the distinction between the two privileges. It is clear there were no separate and distinct proposed jury instructions for each privilege submitted by Hurchalla for the trial court to consider. Similarly, there is nothing in the record suggesting that Hurchalla attempted to offer two separate privileges for the jury to consider. Instead, Hurchalla's counsel submitted "Defendant's Proposed Jury Instruction No. 10 First Amendment Privilege," which actually contained the elements of the common law privilege, rather than the First Amendment privilege.

There are important differences between the federal constitutional First Amendment privilege to petition government and the Florida common law privilege to speak to another about matters of mutual and public interest. Our supreme court, in *Nodar v. Galbreath*, 462 So. 2d 803 (Fla. 1984), explained the similarities and differences.

Both privileges are qualified, meaning they are not absolute. *Id.* at 806 (discussing *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), regarding the right of a public official to bring a defamation action and describing the Florida common law privilege as "conditional" and "qualified"). Both privileges can be overcome by a showing of malice. *Id.* However, the types of malice necessary to overcome the privileges are different. *Id.* To overcome the First Amendment privilege, *actual malice* must be shown. *Id.* In contrast, *express malice* must be shown to overcome the Florida common law privilege. *Id.* The supreme court described the difference in the malice standards:

> "Actual malice[]" . . . consists of knowledge of falsity or reckless disregard of truth or falsity, and must be shown by clear and convincing evidence. Express malice under the common law of Florida, necessary to overcome the common-law qualified privilege, is present where the primary motive for the statement is shown to have been an intention to injure the plaintiff. The plaintiff need only show this fact by a preponderance of the evidence, the ordinary standard of proof in civil cases.

*Id.* at 806-07 (internal citations omitted). Thus, not only are the standards of malice different, but so are the burdens of proof to establish the malice.

6

The differences between the two privileges are important for understanding the proper interplay between the First Amendment privilege and the common law privilege with the elements of tortious interference with contractual relationships. For example, the two privileges require different types of malice: actual malice or express malice. Hurchalla argued only express malice for her defense in the trial court. While she affirmatively requested an instruction discussing *express* malice below, on appeal, she argues the trial court failed to instruct on *actual* malice. Additionally, regarding the interplay of privilege with the elements of tortious interference and the burden of proof as to privilege, defense counsel briefly argued at one point that it was Lake Point's burden to negate Hurchalla's privileged statements; however, that argument was virtually abandoned or countermanded by defense counsel's repeated assertion that the privilege was an affirmative defense.

Because defense counsel's submissions and arguments during the charge conference failed to make important distinctions between the two privileges, we determine the trial court's instructions regarding privileged communication and the privilege defense were not reversible error.[1] *See Universal Ins. Co. of N. Am. v. Warfel*, 82 So. 3d 47, 65 (Fla. 2012) ("Fundamental error is waived where defense counsel requests an erroneous instruction."); *Goodwin v. State*, 751 So. 2d 537, 544 (Fla. 1999) ("If the error is 'invited,' . . . the appellate court will not consider the error a basis for reversal." (footnote omitted)).

*Sufficiency of Evidence Concerning the First Amendment Privilege*

We address the argument by Hurchalla's appellate counsel that "an appellate court has an obligation 'to make an independent examination of the whole record' to ensure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499, 104 S. Ct. 1949, 1958 80 L. Ed. 2d, 502, (1984) (quoting *Sullivan*, 376 U.S. at 284-86, 84 S. Ct. at 728-29); *see also Seropian v. Forman*, 652 So. 2d 490, 494 (Fla. 4th DCA 1995). In other words, we address Hurchalla's counsel's assertion that it is our responsibility to determine if there was clear and convincing evidence to support a determination that Hurchalla demonstrated *actual malice* by interfering with Lake Point's contract.

---

[1] Because we determined above that there is no reversible error in the jury instructions due to the fact that separate instructions for each privilege were not requested, we do not address Hurchalla's argument on appeal that express malice must be the *sole*, rather than merely the *primary*, motive in a tortious interference case.

As discussed above, *actual malice* "consists of knowledge of falsity or reckless disregard of truth or falsity, and must be shown by clear and convincing evidence." *Nodar*, 462 So. 2d at 806. In this case, Hurchalla sent an email to all five county commissioners on January 4, 2013, expressing her concerns about the Project. We focus on two statements in the email that Lake Point contends were false (as alleged in the operative amended complaint). After discussing the status of the project back in 2008, Hurchalla made the following statement:

> At that point[,] [in 2008,] the District staff continued to suggest some vague storage value but changed the emphasis to the STA [stormwater treatment area] that would be built on site as the completion of the project in 20 years. A study was to follow that *documented the benefits* [of the stormwater treatment area]. *That study has not been provided.*

(emphases added). Several sentences later, Hurchalla wrote in a bullet point: "Neither the storage *nor the treatment benefits have been documented.*" (emphasis added).

These statements are examples of competent substantial evidence that clearly and convincingly proved that Hurchalla demonstrated actual malice in interfering with Lake Point's contracts with the County and the District, by making statements she either knew were false or with reckless disregard as to whether they were false. Hurchalla's comments were represented as statements of fact, as opposed to statements of pure opinion. Even if we viewed the statements as "mixed opinions," the statements would not be privileged under the First Amendment. *See Zambrano v. Devanesan*, 484 So. 2d 603, 606-07 (Fla. 4th DCA 1986) (determining statements were not privileged opinion "where the speaker or writer neglects to provide the audience with an adequate factual foundation prior to engaging in the offending discourse"). The evidence before the jury showed that Hurchalla *admitted* that there actually were documented treatment benefits. At trial, she stated: "As far as the treatment benefits, there is a study [documenting treatment benefits], and *I did review that study* . . . [but i]t's a preliminary study and other studies would need to be done." (emphasis added). Similarly, her expert agreed that 2008 models showed storage and treatment benefits of the stormwater treatment area. Therefore, even if Hurchalla thought there should have been more studies, she admitted that she had *reviewed* the study showing treatment benefits, and thus, she was aware that her statement that there were *no* documented benefits was false.

It is also significant that the false statements were emailed to two recently elected commissioners, Commissioners Scott and Haddox, who each admitted at trial that they had not read the permits or studies conducted on the Project, indicating that they were unfamiliar with the details about the Project (establishing reckless disregard for the truth). *See Zambrano*, 484 So. 2d at 606-07. Thus, upon our independent review of the record, we determine there was sufficient clear and convincing evidence to refute Hurchalla's First Amendment privilege to petition her government as to those two statements.

*Sufficiency of Evidence Concerning the Florida Common Law Privilege*

Hurchalla also argues the evidence was insufficient to prove she made false statements with express malice. We determine that Hurchalla has not shown reversible error.

Case law indicates that there are two ways that express malice can be proven. Some cases discuss that express malice is proven when the motive is characterized as "out of spite, to do harm, or for some other bad motive." *See Nodar*, 462 So. 2d at 811 (explaining that "[s]trong, angry, or intemperate words do not alone show express malice; rather, there must be a showing that the speaker used his privileged position 'to gratify his malevolence'" (quoting *Myers v. Hodges*, 44 So. 357, 362 (Fla. 1907))); *Boehm v. Am. Bankers Ins. Grp., Inc.*, 557 So. 2d 91, 97 (Fla. 3d DCA 1990) (applying the description of express malice in *Nodar* to a tortious interference claim). Other cases contend that "even where the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used," thus demonstrating the required express malice. *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004); *see also Morsani v. Major League Baseball*, 663 So. 2d 653, 657 (Fla. 2d DCA 1995) (reversing dismissal of tortious interference complaint, holding that allegations of "the use of threats, intimidation, and conspiratorial conduct" were indicative of malice).

We agree with the proposition that in tortious interference cases, when a privilege is asserted for the interference, the express malice necessary to negate the privilege can be proven either by direct or circumstantial evidence of malice through malevolent intent to harm, or by harm accomplished by improper methods. In this case, we find that there was sufficient evidence as to both methods. We address the issue of proof of express malice by improper methods, followed by our analysis as to malevolent intent.

*Express Malice – Improper Methods*

9

In his dissent in *GNB, Inc. v. United Danco Batteries, Inc.*, 627 So. 2d 492 (Fla. 2d DCA 1993), Judge Altenbernd expressed his view that "[i]mproper business methods seem to fall into three distinct categories: (1) acts which are already proscribed by statute, (2) acts which constitute separate independent torts, and (3) other ill-defined 'bad' acts." *Id.* at 494 (Altenbernd, J., dissenting). Here, the trial court's instruction to the jury included Judge Alternbernd's second category of improper methods, namely, misrepresentation. One of the instructions given to the jury regarding tortious interference was:

> You must render your verdict in favor of Hurchalla on Lake Point's tortious interference claim if you find that Hurchalla *used proper methods* to attempt to influence Martin County. . . . However, *deliberate misrepresentation* of facts are not considered a proper method.

(emphases added).

Florida Standard Jury Instruction 408.5 applies to intentional interference with a contract not terminable at will.[2] As Hurchalla noted in her brief, the notes to instruction 408.5 indicate that for most tortious interference cases there is no "justification" or "privilege"; "[h]owever, in certain relatively rare factual situations, interference with a contract not terminable at will may be justified or privileged," and in those situations, "instruction 408.5 will have to be modified." *See* Fla. Std. Jury Instr. (Civ.) 408.5 notes on use. The notes also point to several sources, including the Restatement (Second) of Torts § 767 (1979), titled "Factors in Determining Whether Interference is Improper." Section 767 states that "[t]he issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it *in the manner in which* he does cause it." *Id.* (emphasis added). "Thus physical violence, *fraudulent misrepresentation* and threats of illegal conduct are ordinarily wrongful means and subject their user to liability even though he is free to accomplish the same result by more suitable means." *Id.* (emphasis added). We focus on improper means by fraudulent misrepresentation in the instant case.

"Fraudulent misrepresentations are . . . ordinarily a wrongful means of interference and make an interference improper." *Id.* "A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient." *Id.* "[T]here are four elements of fraudulent misrepresentation: '(1) a false statement

---

[2] The parties do not dispute that the contracts were not terminable at will.

concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation.'" *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quoting *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985)).

As we analyzed above, there were two statements in the January 4, 2013 email to all five county commissioners from which the jury could conclude that Hurchalla intentionally, or at the least, with reckless disregard, made purportedly factual statements to induce the BOCC not to go forward with its contract with Lake Point. Using the elements of misrepresentation described in *Butler*: (1) Hurchalla made two false statements concerning a material fact to the BOCC (effectively, the County); (2) Hurchalla knew that the representations were false; (3) Hurchalla intended that the representations induce the BOCC (the County) to act on them; and (4) the County was injured when the BOCC acted upon the representation and was subsequently sued for its actions based on the reliance.

The Restatement also discusses the situation where an actor "seek[s] to promote not solely an interest of his own but a public interest." Restatement (Second) of Torts § 767. In the instant case, Hurchalla put on evidence and maintained that she is a champion for environmental causes, and that she did not act with the purpose of harming Lake Point, but "to promote the public interest in the environment." However:

> If the actor [Hurchalla] causes a third person [the County] not to perform a contract or not to enter into or continue a contractual relation with the other [Lake Point] in order to protect the public interest affected by these practices, relevant questions in determining whether his [or her] interference is improper are: whether the practices are actually being used by the other [Lake Point], whether the actor [Hurchalla] actually believes that the practices are prejudicial to the public interest, whether his [or her] belief is reasonable, whether he [or she] is acting in good faith for the protection of the public interest, whether the contractual relation involved is incident or foreign to the continuance of the practices and *whether the actor* [Hurchalla] *employs wrongful means to accomplish the result*.

*Id.* (emphasis added). According to the evidence, several of the factors clearly weigh in favor of Hurchalla. However, as we discussed above, there was sufficient evidence presented for the jury to decide the issue of express

malice based on Hurchalla using wrongful means to interfere in Lake Point's contract with the County by the use of misrepresentations to the BOCC in her January 4, 2013 email to the commissioners.

*Express Malice – Malevolent Intent to Harm*

We also conclude that there was sufficient evidence presented to the jury to prove that Hurchalla demonstrated express malice toward Lake Point through malevolent intent to harm. In addition to her January 4, 2013 email, there were emails she sent to her commissioner friends instructing them in detail on what to do at board meetings to work towards voiding the Interlocal Agreement, signed by her as "Deep Rockpit," as well as references to herself in emails as "Ms. Machiavelli." That evidence, coupled with evidence of her significant influence with a majority of the commissioners and her ability over time to have them assert oppositional positions on a project they knew little-to-nothing about, was sufficient to support an inference of malevolent intent to harm Lake Point.

*Conclusion*

Having determined that Hurchalla has not demonstrated trial court error regarding the jury instructions on the defense of privilege, and the evidence was sufficient to allow the jury to find in favor of Lake Point on its claim of tortious interference by Hurchalla, we affirm the trial court rulings and the judgment entered against Hurchalla.

*Affirmed.*

DAMOORGIAN and FORST, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**

12