797 So.2d 614 (2001)
POPULAR BANK OF FLORIDA, Appellant,
v.
R.C. ASESORES FINANCIEROS, C.A., Appellee.
No. 3D00-1443.
District Court of Appeal of Florida, Third District.
October 10, 2001.
*615 Steel, Hector & Davis, LLP, and Lewis F. Murphy, and Wendy S. Leavitt, and Gregory C. Ward, Miami, for appellant.
*616 Stack, Fernandez, Anderson, Harris & Wallace, P.A. and Brian J. Stack, Miami, for appellee.
Before COPE, GERSTEN, and GREEN, JJ.
GREEN, J.
This is an appeal from a final judgment entered in a breach of contract case after a jury trial as well as a cross-appeal from the dismissal of a claim for tortious interference with a business relationship. We affirm the final judgment and reverse the dismissal of the tortious interference claim.
Appellant, Popular Bank of Florida ("Popular Bank"), is chartered under the laws of the state of Florida and is based in Miami, Florida. Popular Bank maintains accounts in Florida for both domestic and foreign depositors, including those living in Venezuela. Prior to 1987, Popular Bank provided a branch office ("Branch 8") in Caracas, Venezuela, to service its Venezuelan depositors. When, however, it decided to close Branch 8 in 1987, Popular Bank began contracting out its banking service functions, thus commencing its relationship with appellee, R.C. Asesores Financieros, C.A. ("RCAF"). Popular Bank entered into a contract with RCAF to service the Branch 8 depositors located in Venezuela. At the time, RCAF was a Venezuelan corporation owned and controlled by Frank Ratmiroff, a former Popular Bank officer and, to a lesser extent, his wife, Ivonne.
According to the terms of the original contract executed by the parties, RCAF was to provide traditional banking services to Popular Bank's Branch 8 depositors and provide various consulting services to Popular Bank concerning the investment climate in Venezuela. In return, Popular Bank agreed to pay RCAF based upon an estimated annual budget to cover operation costs.
In 1998, the parties amended their original contract. In addition to expanding the scope of services to be provided by RCAF, the amended contract altered the way Popular Bank compensated RCAF; provided an exclusivity or non-compete provision; and made provisions for remuneration in the event Popular Bank chose to terminate the agreement.[1] After the execution of *617 this amended agreement, RCAF's founder and president, Frank Ratmiroff, was diagnosed with a severe medical condition which later proved to be fatal. Prior to his death, however, Mr. Ratmiroff decided to familiarize his wife, Ivonne, with RCAF's business operations and invited Ricardo Zuloaga, Jr. ("Zuloaga"), the son of a trusted Popular Bank director, to become a 25% shareholder in RCAF. Mr. Ratmiroff died in 1992, at which time his widow, Ivonne, immediately assumed the position of RCAF's president.
Popular Bank and RCAF operated under the amended contract for approximately six years. Meanwhile, the Branch 8 deposit base continued to grow under Ivonne Ratmiroff's leadership. Popular Bank provided RCAF with monthly contract statements detailing the commissions paid by Popular Bank to RCAF for the preceding month. Popular Bank also provided monthly statements for RCAF's corporate bank account, listing all credits and debits to and from RCAF's accounts. Although the contract statements contained boxes where Popular Bank could have recorded the special transaction fees paid to RCAF, the bank left almost all of these boxes empty. Rather than a monthly itemization and payment of transaction fees, the bank provided RCAF with advices of credit which accompanied the bank statements. These advices served to inform RCAF of when Popular Bank had credited its bank account with the special transaction fees.
After years of performance under the amended contract, a dispute arose between the parties that was wholly unrelated to the bank's payment of fees under the contract. The dispute escalated and, on or about April 1, 1996, while Mrs. Ratmiroff was visiting South Florida, the bank summoned her to its offices in Miami and gave its written notice terminating RCAF as Popular Bank's agent in Venezuela. The termination was to become effective 90 days later (i.e. July 1, 1996), pursuant to Section 9 of the 1989 amended contract. At that time, Mrs. Ratmiroff was also informed of the bank's appointment of Zuloaga as RCAF's replacement.
Thereafter, it is undisputed that the bank failed to pay RCAF the service fees and termination adjustment fees under the contract. As a result, RCAF filed the instant action against the bank. The five count second amended complaint alleged: (1) breach of contract; (2) breach of implied duty of good faith; (3) tortious interference of an advantageous business relationship; (4) declaratory relief; and (5) tortious interference with RCAF's relationship with Zuloaga. Counts two, three and five were dismissed by the trial court prior to trial. Additionally, RCAF filed a motion for partial summary judgment on count IV for declaratory relief for a determination of whether the exclusivity provision was enforceable. Prior to trial, the court granted this motion based upon its conclusion, among other things, that Popular Bank's duty to pay fees under the termination provision and RCAF's duty to adhere to the exclusivity provision were interdependent. Thus, because Popular Bank stipulated that it had ceased payment of the fees, RCAF was released from the exclusivity provision effective July 1, 1996 (the end of the 90 day notice period). The only remaining count on RCAF's complaint was count I for breach of contract.
*618 In response to the breach of contract complaint, Popular Bank filed a counter-claim alleging: (1) breach of the exclusivity provision of the 1989 amendment; (2) breach of a separate courier contract; (3) RCAF's tortious interference with Popular Bank's relationship with its Venezuelan depositors; and (4) breach of duty of good faith. Prior to trial, the court dismissed Popular Bank's claims for tortious interference and breach of good faith. Popular Bank voluntarily dismissed its claim for breach of the courier contract. Thus, the only remaining claim for trial on the counter-claim was for breach of the exclusivity provision.
At trial, Popular Bank moved for a directed verdict on various grounds at the close of RCAF's case. That motion was denied. During its case in chief, Popular Bank voluntarily dismissed its counter-claim alleging breach of the exclusivity provision. At the close of all the evidence, Popular Bank renewed its motion for a directed verdict, which was again denied. RCAF moved for a partial directed verdict on the issue of liability, which the trial court denied.
During the trial, RCAF requested the jury to award $270,628, which included unpaid service fees for the remaining three months of the contract (i.e. April to June) plus termination fees, along with $451,303 in additional special transaction fees going back five years. The jury returned its verdict finding that Popular Bank had breached the 1989 amendment, and awarded RCAF $270,000 in unpaid service and termination fees, plus $500,000 in unpaid special transaction fees. After the parties stipulated to the calculation of prejudgment interests, the court entered a final judgment pursuant to the jury's verdict. Thereafter, Popular Bank filed a motion to amend judgment pursuant to Rule 1.530(g), Florida Rules of Civil Procedure, requesting a remittitur of the jury's award of $500,000 for the special transaction fees. The bank argued that the award of these fees was completely speculative and contrary to the $451,303 estimated figure submitted by RCAF's expert witness. The trial court denied the motion and this appeal followed.
On the main appeal, Popular Bank raises three issues. First, it asserts that the trial court erred when it denied the motion for directed verdict on RCAF's claim for special transaction fees on the grounds that RCAF waived its rights to such fees. Alternatively, if there had been no waiver, Popular Bank asserts that the trial court erred when it denied its request for remittitur of the jury's award for special transaction fees by $48,697. Finally, Popular Bank maintains that the trial court erred when it denied its motion for directed verdict on RCAF's claim for unpaid service fees and termination adjustment fees, pursuant to the doctrine of "election of remedies." By way of a cross-appeal, RCAF contends that the trial court erred in dismissing its claim against the bank for tortious interference with its advantageous business relationship for failure to state a cause of action.
As for the main appeal, we conclude first that there was no error in the trial court's refusal to grant either a directed verdict or a judgment notwithstanding the verdict in favor of Popular Bank on the issue of RCAF's waiver of its claimed fees. The basis of this motion essentially was that RCAF waived its rights to certain special transaction fees by failing to object to their non-payment and accepting the monthly contract and bank statements for more than eighty (80) months. Assuming, without deciding, that Popular Bank properly raised this waiver issue as an affirmative *619 defense[2] and/or this issue was tried by consent of the parties below, we find no reversible error in the trial court's denial of the bank's motion for directed verdict.
As both parties recognize, waiver is the intentional or voluntary relinquishment of a known right and may be inferred from conduct or acts putting one off his guard and leading him to believe that the demanding party has waived the right sought to be enforced. See Gilman v. Butzloff, 155 Fla. 888, 22 So.2d 263 (1945). Generally speaking, the issue of waiver is one for the fact finder. See Dumor Avionics, Inc. v. Hangar One, Inc., 319 So.2d 95, 97 (Fla. 3d DCA 1975); Southeast Grove Mgmt., Inc. v. McKiness, 578 So.2d 883, 886 (Fla. 1st DCA 1991); Hill v. Ray Carter Auto Sales, Inc., 745 So.2d 1136, 1138 (Fla. 1st DCA 1999). Based upon our careful review of the record evidence and the reasonable inferences therefrom, there was a genuine factual issue for the jury as to whether RCAF knowingly refrained from demanding the payment of the subject fees. Consequently, the trial court correctly denied Popular Bank's motion for directed verdict and judgment notwithstanding the verdict and correctly submitted this issue to the jury. See Collins v. School Bd. of Broward County, 471 So.2d 560 (Fla. 4th DCA 1985), writ dismissed, 491 So.2d 280 (Fla.1986); Cox v. R.O. Corp., 470 So.2d 790 (Fla. 3d DCA 1985); Maximo Moorings Marine Ctr., Inc. v. Walke, 196 So.2d 215 (Fla. 2d DCA 1967); see also Hendricks v. Dailey, 208 So.2d 101, 103 (Fla.1968).
Popular Bank alternatively contends that the trial court reversibly erred by denying its motion to amend judgment which sought a $48,697 remittitur of the jury's award of special transaction fees pursuant to section 768.74, Florida Statutes (1999)[3], where RCAF's expert witness *620 conservatively estimated such fees to be $451,303, and the jury awarded $500,000 to RCAF. We find no merit to this argument.
When RCAF's expert witness, Stanley Tate, testified that RCAF was entitled to $451,303 as special transaction fees from Popular Bank, he repeatedly emphasized that this was only a conservative estimate of the amount owing and due RCAF, because Popular Bank had not provided him with certain requested documents that would have allowed him to arrive at a more exact figure. Although Popular Bank asserted that they did not maintain such records, Mr. Tate testified that Popular Bank could have maintained such records and indeed had a duty to do so.[4] Indeed, at one point, Mr. Tate indicated to the jury that in all probability, the fees owing to RCAF were actually higher.[5] We think *621 that such evidence was sufficient to support the jury's verdict in this case.
"Great effect is given by our judicial system to the fact finder's award of damages." See Allred v. Chittenden Pool Supply, Inc., 298 So.2d 361, 365 (Fla.1974). Before a trial judge may set aside a jury's verdict on the grounds of excessiveness, the record must affirmatively show the impropriety of the verdict, or there must be an independent determination by the trial judge that the jury was influenced by considerations outside the record. See Evering v. Smithwick, 526 So.2d 185, 186 (Fla. 3d DCA 1988) citing Ashcroft v. Calder Race Course, Inc., 492 So.2d 1309 (Fla. 1986); Wackenhut Corp. v. Canty, 359 So.2d 430, 434 (Fla.1978); Laskey v. Smith, 239 So.2d 13, 14 (Fla.1970). The amount of the excess must be readily apparent from the record. Evering, supra.
Given the equivocal and conservative estimate of special transaction fees owing and due RCAF given by its expert witness, we cannot conclude that denying Popular Bank's request for a remittitur was a gross abuse of discretion by the trial court. The fact that the jury awarded RCAF $48,697 more than the conservative estimate given by its expert witness in this case does not thereby render the award excessive. See e.g. Braddock v. Seaboard Air Line R. Co., 80 So.2d 662 (Fla.1955) (a jury might properly award damages equal to or in excess of those requested by counsel in closing argument); Rudy's Glass Const. Co. v. Robins, 427 So.2d 1051 (Fla. 3d DCA 1983) (same); Lopez v. Cohen, 406 So.2d 1253 (Fla. 4th DCA 1981) (same). Moreover, we cannot say with any degree of assuredness, that the verdict exceeded the limit of a reasonable range so as to shock the judicial conscience. See Malpass v. Highlands Ins. Co., 387 So.2d 1042, 1043 (Fla. 3d DCA 1980).
As its final point on appeal, Popular Bank argues that the trial court erred in allowing RCAF's claim for unpaid termination fees to go to the jury after previously declaring that RCAF was released from the exclusivity provision upon the Bank's failure to pay such fees. In other words, Popular Bank maintains that it was improper for RCAF to both obtain relief from the exclusivity provision and to seek a damage award for the same alleged breach. Hence, Popular Bank contends that its motion for directed verdict on the grounds of the election of remedies doctrine should have been granted by the trial court. We disagree and conclude that this doctrine was not implicated in this case.
The election of remedies doctrine has been defined as "an application of the doctrine of estoppel and operates on the theory that a party electing one course of action should not later be allowed to avail himself of an incompatible course ..." See Barbe v. Villeneuve, 505 So.2d 1331, 1332-33 (Fla.1987). Under Florida law, however, the election of remedies doctrine applies only where the remedies in question are coexistent and inconsistent. Id.
We cannot conclude that RCAF pursued coexistent and inconsistent remedies when it sought and obtained the declaratory relief that excused it from the exclusivity provision upon Popular Bank's breach of its contractual obligation to pay termination fees and then later sought damages for that same breach. As RCAF correctly points out, claims for damages and declaratory relief are consistent and cumulative *622 remedies. See Maciejewski v. Holland, 441 So.2d 703, 704 (Fla. 2d DCA 1983) ("The existence of another remedy does not preclude a judgment for declaratory relief."); see also Thomas v. Cilbe, Inc., 104 So.2d 397, 402 (Fla. 2d DCA 1958) ("[i]t is generally held that a money judgment may be obtained for damages sought as incidental or supplemental relief pursuant to a declaratory decree."). Upon Popular Bank's material breach of the 1989 amendment by failing to pay service and termination adjustment fees, RCAF was excused as a matter of law from complying with its exclusivity or noncompete provision and to recover damages for the bank's breach. See Bradley v. Health Coalition, Inc., 687 So.2d 329, 333 (Fla. 3d DCA 1997) ("[A] material breach of [contract] allows the non-breaching party to treat the breach as a discharge of his contractual liability."); Hustad v. Edwin K. Williams & Co., 321 So.2d 601, 603 (Fla. 4th DCA 1975) ("breach terminates the contract so that the injured party is no longer obligated to perform that which was to be performed in consideration of the contract,..."); accord Hospital Mort. Group v. First Prudential Dev. Corp., 411 So.2d 181, 182 (Fla.1982) ("non-breaching party is relieved of its duty to tender performance and has an immediate cause of action against the breaching party"). Thus, the doctrine of election of remedies was not triggered here and the denial of the bank's motion for directed verdict was proper.
Having addressed all of the issues on the main appeal, we now turn our attention to RCAF's cross-appeal. RCAF asserts that the trial court erred in dismissing its claim for tortious interference, wherein it alleged that the bank tortiously interfered with RCAF's valuable business relationship with its minority shareholder, Richard Zuloaga. We agree.
The four essential elements of a claim for tortious interference with a business relationship are: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damages to the plaintiff as a result of the breach of the relationship. See Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126 (Fla.1985). Accepting, as we must, all well-pled allegations as true, we conclude that RCAF's complaint adequately stated a cause of action for the tortious interference claim. See Sarkis v. Pafford Oil Co., Inc., 697 So.2d 524, 526 (Fla. 1st DCA 1997). "If a complaint alleges the necessary legal requisites of a cause of action and the allegations are sufficient to inform the defendant of the nature of the cause against him, then it must be held sufficient." See Lewis State Bank v. Travelers Ins. Co., 356 So.2d 1344, 1345 (Fla. 1st DCA 1978). The trial court's dismissal of this claim was therefore error.
Thus, for the foregoing reasons, we affirm the final judgment and reverse the dismissal of RCAF's tortious interference claim.
Affirmed in part and reversed in part.
GERSTEN, J., concurs.
COPE, J. (concurring in part and dissenting in part).
I agree on all points except the remittitur. On that issue, we should direct that the trial court reduce the compensatory damage award from $500,000 to $451,303. The plaintiff's damages expert, Stanley Tate, testified that the plaintiff was entitled to $451,303 in special transaction fees. He stated that this was a conservative estimate, and that the probability was that *623 the unpaid fees were higher. Tellingly, however, Mr. Tate did not come up with any higher calculation. Thus, the only reasoned calculation of this element of the plaintiff's damages was $451,303.
I cannot agree with the majority position that once an expert says that his or her calculation is conservative, and that the actual damages are probably higher, it follows that the jury can arbitrarily pick any higher figure that it chooses. In this case the jury had a fondness for round numbers, and picked $500,000a figure which is nowhere supported by any evidence. If the majority's logic holds, then the jury could just as well pick $600,000, or $900,000, or any other number which is greater than the "conservative" estimate.
Jury awards have to be supported by the evidence. See Brown v. Estate of Stuckey, 749 So.2d 490, 498-99 (Fla.1999). The expert's best effort at a calculation was $451,303. If the plaintiff wanted a greater award, it was up to the plaintiff and the expert to supply some reasoned basis in the evidence to support a higher figure. Speculation is not good enough.
The majority opinion relies on personal injury cases standing for the proposition that a jury may award damages equal to, or in excess of, those requested by counsel in closing argument. Opinion at 13-14. Those cases are not on point. The issue in the present case is not whether the jury was limited by the amount requested in closing argument. The question is whether there is any evidentiary basis for an award in excess of $451,303.
While I entirely agree with the remainder of the opinion, I believe the defendant's remittitur argument is well taken. We should reverse on that issue.
NOTES
[1] Specifically, with regard to the fees at issue in this case, the amended agreement provided as follows:

(5) FEES
The Bank will pay the Agent the following fees based on all "Branch 8" accounts:
(a) Service Fees
(i) 0.35% per annum over the aggregate average monthly balances of interest bearing deposit accounts.
(ii) 1% per annum over the average monthly balances of non-interest bearing deposit accounts.
(b) Special Transaction Fees
25% of the Bank's net fee income on transactions referred by the Agent, such as credit card fees, foreign exchange and securities transactions, after deducting telex, fax and/or out-of-pocket expenses incurred directly in each transaction.
* * * *
The exclusivity provision provided that:
(3) Duties of the Agent
(b) Exclusivity
While this agreement is in effect and during such time after its termination as the Agent continues to receive monetary compensation from the Bank, the Agent shall not promote, develop business for or service customers of any other organization without prior written authorization from the Bank.
* * * *
The termination provision provided that:
(8) TERMINATION
This agreement may be terminated by either party upon 90 days written notice (the notice period):
(a) If the contract is terminated by the Bank, the Bank shall at the end of the notice period:
(i) Pay a termination adjustment of $1000 per month for a period of up to six months, if the deposit balances in the accounts of customers serviced by the Agent aggregate no less than $5,000,000 as of the termination date.
(ii) Continue to pay the Service Fees for a period of twelve months.
(b) If the contract is terminated by the Agent, the Agent shall continue to receive the Service Fees for a period of six months.
[2] As an affirmative defense to RCAF's claim, Popular Bank merely stated that RCAF never made a demand for these allegedly unpaid fees.
[3] That statute provides in relevant parts as follows:

(1) In any action to which this part applies wherein the trier of fact determines that liability exists on the part of the defendant and a verdict is rendered which awards money damages to the plaintiff, it shall be the responsibility of the court, upon proper motion, to review the amount of such award to determine if such amount is excessive or inadequate in light of the facts and circumstances which were presented to the trier of fact.
* * * *
(3) It is the intention of the Legislature that awards of damages be subject to close scrutiny by the courts and that all such awards be adequate and not excessive.
* * * *
(5) In determining whether an award is excessive or inadequate in light of the facts and circumstances presented to the trier of fact and in determining the amount, if any, that such award exceeds a reasonable range of damages or is inadequate, the court shall consider the following criteria:
(a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
(b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
(c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
(d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and
(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.
(6) It is the intent of the Legislature to vest the trial courts of this state with the discretionary authority to review the amounts of damages awarded by a trier of fact in light of a standard of excessiveness or inadequacy. The Legislature recognizes that the reasonable actions of a jury are a fundamental precept of American jurisprudence and that such actions should be disturbed or modified with caution and discretion. However, it is further recognized that a review by the courts in accordance with the standards set forth in this section provides an additional element of soundness and logic to our judicial system and is in the best interests of the citizens of this state.
[4] Stanley Tate, RCAF's banking expert, testified as follows on this point:

Q. In other words, does this reflect your opinion that of all the non-interest income earned by the bank in any year, does that reflect your opinion that Branch 8 would have generated that proportion of the total non-interest income in each year?
A. Yes, because I had no other ability to make the determinations. I requested that the bank furnish me their breakdown of what charges were made to the Branch 8 customers. They said they didn't have it. That they never broke it down. Whether they did or not, I don't know. I couldn't get it so I had no way to make a determination except on the basis of my experiences that there's a direct relationship to these charges to the overall total deposits in the bank as it relates to the non-earned income.
* * * *
Q. If the bank wanted to demonstrate, if Popular Bank wanted to demonstrate in this trial, precisely how much money it earned in fees from correspondent banking, should Popular Bank be able to print out a report showing those precise fees?
A. Absolutely.
Q. Now, is it your opinion that if Popular Bank wanted to print out, or to obtain a precise figure on fee income generated by Branch 8 depositors, should it be able to print out a comprehensive report detailing all categories of fee income generated by Branch 8?
A. Without any question.
* * * *
Q. And based upon your understanding of the way banks are operated and regulated in this country, is it your testimony that the banks should be able to determine the total amount of fee income generated by its Branch 8 in Venezuela?
A. Yes. On an annualized basis. I don't know what the statutory requirement would be to keep those records over a period of time. But certainly on a current basis, those records are required to be kept and maintained. And there's a length of time they would have to be, whether it's a year or after the year it occurs or two years, I don't know. But there's a standard amount of time they have to be kept.
[5] Mr. Tate testified thusly:

Q. I believe I covered this, but let me just be clear. For the kinds of services['] bank fees that are represented in the chart that you prepared, fees on deposits accounts, foreign exchanges, letters of credit, wire transfers and other categories, is it your opinion that a foreign depositor such as a Branch 8 depositor, would generate more of those kinds of fees than a domestic depositor?
A. Without a question. That's why I used the word[s], they were conservative.
Q. Can you explain why?
A. Because they would utilize those kinds of services far more than a domestic account would use, such as the letters of credit, wire transfers. These are not normally done to any great extent certainly nowhere near the percentage between the Branch 8 accounts to the total deposits. So I would say that without any question, the numbers I use as a percentage of the total deposits, were extremely conservative. The probability is that the fees that were generated by those foreigners were even higher.